**AMOCO CORPORATION (formerly Standard Oil Company (Indiana)) and Affiliated Corporations, Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

No. 96–3632.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1997.

Decided March 11, 1998.

James J. Lenahan, Chicago, IL, Jay L. Carlson, Alan I. Horowitz, Robert L. Moore, II (argued), Miller & Chevalier, Washington, DC, for Petitioner–Appellee.

Stuart L. Brown, Cynthia J. Mattson, Internal Revenue Service, Gary R. Allen, David E. Carmack, Charles Bricken (argued), Department of Justice, Tax Division, Appellate Section, Loretta C. Argrett, Department of

Justice, Tax Division, Washington, DC, for Respondent–Appellant.

Before RIPPLE, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The Internal Revenue Code permits U.S. taxpayers who have paid the equivalent of income taxes to foreign governments to credit those amounts against their U.S. taxes, with certain limitations. See Internal Revenue Code of 1986 § 901 *et seq.*, 26 U.S.C. § 901 *et seq.*; Internal Revenue Code of 1954 § 901 *et seq.*, 26 U.S.C. § 901 *et seq.* (1982).[1] We must decide in this case whether Amoco was entitled to claim credits derived from some of its operations in the Arab Republic of Egypt ("ARE" or "Egypt"). This would be complex enough if all we had to do was ascertain what the law of Egypt was and whether Amoco's tax payments to the Egyptian authorities met the criteria of § 901, but those questions begin rather than end our inquiry. As the following account of the facts indicates, we must also consider the effect of Egypt's decision to use a wholly owned corporate entity for its critically important oil business, as well as the significance of certain mistakes that entity made in handling the Egyptian taxes on its transactions with Amoco.

## I

Amoco Corporation, formerly Standard Oil Company (Indiana), through its affiliate the Amoco Egypt Oil Company (all of which we refer to as "Amoco"), has been active in crude oil and natural gas exploration and production in Egypt since the 1960s. Under the Egyptian Constitution and implementing Egyptian law, the ARE owns all the country's natural resources, including its oil and gas. Within the executive branch of the government, the Ministry of Petroleum and Mineral Resources is responsible for the management of Egypt's mineral resources. Affiliated with the Ministry is the Egyptian General Petroleum Corporation (EGPC), which was initially created in 1958 pursuant to Egyptian Law No. 167 of 1958, and later reconstituted under the same name by Egyptian Law No. 20 of 1976. According to the 1976 statute, EGPC is "a Public Authority endowed with an independent juristic personality, engaged in developing and properly utilizing the petroleum wealth and in supplying the country's requirements of the various petroleum products." EGPC is the entity through which the government organizes oil concession agreements with outside companies.

EGPC is wholly owned by the ARE and controlled by the Egyptian Government. Upon its dissolution, all of its assets must revert to the state. The chair of its board of directors is appointed by decree of the President of the Republic, and the remaining members are appointed by decree of the Prime Minister on the recommendation of the Minister of Petroleum and Mineral Resources. Resolutions of the Board must be forwarded to the Minister for ratification, amendment, or cancellation. Notwithstanding these close ties to the Government, EGPC has an independent budget prepared in the same manner as a commercial budget, and it is subject to Egyptian income tax. Its funds bear the oxymoronic label "privately owned State funds." Except for certain reserves, however, its after-tax surplus (if any) each year is turned over to the public treasury, and in the (as of yet hypothetical) event there were a deficit the treasury would be responsible for it.

When Amoco began its Egyptian oil operations in the early 1960s, it negotiated agreements with EGPC that set forth the terms under which it would do business. Over the course of its first decade in Egypt Amoco entered into three such concessions: the Western Desert Concession Agreement (October 1963), the Gulf of Suez Concession Agreement (February 1964), and the Western Desert and Nile Valley Concession Agreement (September 1969). Under these

---

1. The 1954 code as amended applies to this case, and unless otherwise indicated statutory citations (I.R.C. § X or simply § X) are to it. The current code differs in only one relevant way from that applicable to this litigation. Section 901(i) was enacted in 1986 and is applicable to tax years beginning after December 31, 1986. See Pub.L. No. 99–514, 100 Stat. 2085, 2532 (1986). The 1991 amendments to Treas. Reg. § 1.901–2, implementing § 901(i), see T.D. 8372, 1991–2 C.B. 338, 56 Fed.Reg. 56,008 (Oct. 31, 1991), also do not apply.

agreements, Amoco was generally required to pay for all preliminary exploration costs, up to a specified amount, after which Amoco and EGPC split both production costs and crude oil revenues on a 50–50 basis. Each entity paid its own Egyptian income taxes, and in addition each paid royalties and other miscellaneous charges imposed by the government. (These and all other concession agreements in Egypt are technically laws, and before becoming effective are ratified by the legislature and signed by the Egyptian President.) Amoco's exploration efforts were richly rewarded in February 1965, when it struck the El Morgan field in the Gulf of Suez. Production from that field, the largest oil find in Egypt to date, began in February 1967.

Eager to secure for itself a greater share of the benefits from its oil, the Government of Egypt in 1970 began entering into a different type of concession agreement with oil companies. The new agreements used a production-sharing format rather than the 50–50 income-sharing approach of Amoco's early agreements. Under these production-sharing agreements, EGPC holds the concession to explore for and produce petroleum while its foreign partners act as contractors, bearing the cost of all exploration, development, and production activities in return for a negotiated share of the production. Part of the contractor's share is earmarked for the recovery of costs.

Several oil companies entered into production–sharing agreements with EGPC between 1970 and 1974. In 1974, Amoco and EGPC entered into three production-sharing agreements, which related to oil fields not covered by Amoco's earlier income-sharing agreements. In early 1975, Amoco and EGPC began discussing converting the three existing 5050 income-sharing agreements into a single production-sharing agreement that came to be called the Merged Concession Agreement, or MCA. The Tax Court's opinion contains a detailed description of these negotiations. See *Amoco Corp. v. Commissioner*, 71 T.C.M. (CCH) 2613, 2618–20, 1996 WL 139214 (1996). Amoco and EGPC devoted considerable attention in those negotiations to the creditability of Amoco's Egyptian taxes for U.S. tax purposes. Amoco wanted to pay its own Egyp-

tian taxes. EGPC, in contrast, preferred that the transaction be arranged so that Amoco would remain responsible for its own taxes, but EGPC would pay Amoco's taxes out of EGPC's share of the oil produced. (By thus structuring the agreement EGPC would itself sell the oil allocated to taxes, thus obtaining foreign currency.)

The MCA was initialed by the parties in November, 1975, was ratified by the Egyptian Government in February, 1976 (Law No. 15 of 1976), and was effective retroactive to July 1, 1975. In the final draft, Amoco and EGPC agreed that Amoco would be entitled to up to 20% of the crude oil produced as a reimbursement for the costs of exploration, production, and related operations. EGPC and Amoco would share the remaining 80% of production in varying percentages, between 85 and 87% for EGPC and 13 to 15% for Amoco. Out of its share of production, EGPC had to pay the Government of Egypt a royalty of 15% of the total quantity of petroleum produced and saved from the concession; Amoco had no direct royalty obligation to the Egyptian government. Article IV(f) of the MCA addressed the subject of taxes, and stated in pertinent part:

1. AMOCO shall be subject to Egyptian Income Tax Laws and shall comply with the requirements of the A.R.E. Law in particular with respect to filing returns, assessment of tax, and keeping and showing of books and records.

\* \* \*

3. EGPC shall assume, pay and discharge, in the name and on behalf of AMOCO, AMOCO's Egyptian Income Tax out of EGPC's share of the Crude Oil produced and saved and not used in operations under Article VII. All taxes paid by EGPC in the name and on behalf of AMOCO shall be considered taxable income to AMOCO.

\* \* \*

6. In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the GOVERNMENT and AMOCO's Egyptian Income Taxes paid by EGPC on AMOCO's behalf.

As often happens with international agreements, the English version of the text was

not the only one, nor the only authentic one. In the Arabic version of Article IV(f), paragraph 6, which appears if anything to be slightly more authoritative, the Arabic word "minha," meaning "therefrom," appeared immediately after the Arabic words "an takhssim," meaning "to deduct." The term "minha" literally means "from it or her." The Arabic word for taxes is a feminine noun, "daraa'ib," while the Arabic word for income is a masculine noun, "al-dakhl." This brief excursion into Arabic helps to explain why, in later years, EGPC took the position that Article IV(f), para. 6, allowed it to *credit* against its Egyptian taxes the full amount of the taxes it was paying on Amoco's behalf, even though the English version of the text sounds as if Amoco's Egyptian taxes were to be taken as a *deduction* against EGPC's income. In any event, at the time no one appears to have noticed the linguistic ambiguity. (The Egyptian Government eventually concluded that the MCA authorized only deductions, the Tax Court so held, and the Commissioner does not challenge that interpretation on appeal.)

It was not long after the MCA took effect that Amoco got wind of the fact that EGPC was interpreting the agreement to allow it to take a credit against its own Egyptian taxes for the payments it was making on Amoco's behalf. The issue arose no later than September 1980, during the course of discussions between the parties about possible amendments to the agreement. At the same time, Amoco was seeking rulings from the IRS about the creditability of its Egyptian taxes if the agreement were changed in certain ways. In the end, no changes were made in the Egyptian agreement that affected its tax provisions, and it was not until April 1988 that Amoco verified once and for all that EGPC was indeed taking credits for its payments. Amoco then informed the Commissioner of this fact.

Numerous officials in the Egyptian government, both high and low, also became involved in the question of the tax consequences of the MCA. In the end, the key actor turned out to be one Ahmed Ismail, a tax inspector in the Petroleum Section of the Department of Tax on Joint Stock Companies of the Egyptian Tax Department. In December 1989, Ismail conducted his first

audit of EGPC for the 1983–84 tax return. That audit did not challenge EGPC's claimed tax credits for royalties or foreign partner taxes, but Ismail apparently changed his mind when he reviewed EGPC's 1984–85 tax return, and challenged the credits for that year. Ismail continued to monitor EGPC's returns; tax assessment forms sent out for later years do not indicate an allowance of a tax credit for foreign partner taxes, and Ismail testified that the credit was in fact disallowed. Eventually, higher Egyptian tax authorities concluded that under Egyptian law EGPC was not entitled to take a credit for the royalties and foreign partner taxes (including Amoco's). The Minister of Petroleum and Mineral Resources, Dr. Hamdi El Banbi, knew that the change in treatment would have "some" unfavorable impact on EGPC, but by 1992, the Ministers of Finance and Petroleum had worked out an agreement whereby EGPC's tax credits for the contested items would be disallowed for all tax years still open under the law. Given the applicable Egyptian statute of limitations, adjustments were made for taxable periods ending June 30, 1981, and thereafter.

In the meantime, Amoco had been taking a foreign tax credit on its U.S. tax returns in the amount its tax receipts from EGPC indicated had been paid to the Government of Egypt on Amoco's behalf. Our concern at this point is with four tax years: 1979 and 1980, because they were closed under Egyptian law by the time the Egyptian authorities implemented the change from a credit to a deduction, and 1981 and 1982. The Commissioner, in its notice of deficiency and before the Tax Court, argued that Amoco was not entitled to any credits for these latter two years. On appeal the Commissioner concedes that some credit should be granted, but urges us to remand to the Tax Court to determine how much credit Amoco is entitled to, taking into account the changes in the foreign exchange rate (and presumably also the time-value of money) between the time these taxes were credited against Amoco's U.S. taxes and the time when EGPC eventually revised its Egyptian tax filings, in 1992. We do not need to reach the issues specific to the 1981 and 1982 tax years unless we find that Amoco's foreign tax credits for the 1979

and 1980 years were invalid, since holding those earlier credits valid would necessarily imply that the full 1981 and 1982 credits taken by Amoco were also valid.

Relying on the 1983 foreign tax credit regulations and on the "safe harbor" method for determining which tax credits were allowable, see Treas. Reg. § 1.901–2A(e) (1983), Amoco included the Egyptian taxes allegedly paid by EGPC as income, and then claimed the following combination of credits and deductions on its U.S. taxes:

| Year | Egyptian Taxes Allegedly Paid | U.S. Tax Credit | U.S. Tax Deduction |
|------|------|------|------|
| 1979 | $304,015,893 | $215,414,631 | $ 88,601,262 |
| 1980 | $498,086,280 | $459,881,927 | $ 38,204,353 |
| 1981 | $557,873,428 | $383,993,639 | $173,879,789 |
| 1982 | $453,586,679 | $308,490,749 | $145,095,933 |

When the dust settled, the IRS took the position that Amoco's claimed foreign tax credits from those years had to be disallowed, on the theory that EGPC's now unreviewable act of taking a credit against its own Egyptian taxes meant that in effect nothing had been paid on Amoco's behalf. The IRS accordingly issued a notice of deficiency to Amoco on June 18, 1992, challenging Amoco's calculations for the 1979 to 1982 tax years, and listing the following amounts:

| Year | Deficiency |
|------|------|
| 1980 | $109,618,203 |
| 1981 | $200,848,534 |
| 1982 | $155,776,311 |
| TOTAL | $466,243,048 |

(No deficiency was alleged for the 1979 tax year, because Amoco's claimed tax credits for that year were carried forward. The Commissioner's calculated deficiencies do not match the credits initially claimed by Amoco both because of this carryover and because the Commissioner reduced Amoco's income by the tax amounts allegedly paid by EGPC. As noted above, the Commissioner now concedes that some part of the credits claimed for the 1981 and 1982 tax years should have been allowed.)

Amoco responded to this unwelcome missive by filing a petition in the Tax Court contesting the proposed deficiencies. After a two-week trial, the Tax Court found that Amoco was entitled to the credits it had claimed.

**II**

Under I.R.C. § 901(b)(1), United States citizens and domestic corporations are generally allowed to claim tax credits against their U.S. income taxes in "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States[.]" The Treasury has issued regulations defining in greater detail which foreign taxes can support a tax credit under § 901(b)(1). In this case, the parties agree, the 1983 version of Treas. Reg. § 1.901–2, T.D. 7918, 1983–2 C.B. 113, controls. (While this regulation was issued after the tax years in question, Amoco elected to have it apply under § 1.901–2(h)(2) (1983).) Under that regulation, even if foreign taxes were nominally paid, under some circumstances the U.S. taxpayer is nonetheless not entitled to claim a credit on its U.S. tax return:

**(e) Amount of income tax that is creditable.—(1) In general.** Credit is allowed under section 901 for the amount of income tax (within the meaning of paragraph (a)(1) of this section) that is paid to a foreign country by the taxpayer. The amount of income tax paid by the taxpayer is determined separately for each taxpayer.

**(2) Refunds and credits.—(i) In general.** An amount is not tax paid to a foreign country to the extent that it is reasonably certain that the amount will be refunded, credited, rebated, abated, or forgiven. It is not reasonably certain that an amount will be refunded, credited, rebated, abated, or forgiven if the amount is not greater than a reasonable approximation of final tax liability to the foreign country.

\* \* \*

**(3) Subsidies.—(i) General rule.** An amount is not an amount of income tax paid by a taxpayer to a foreign country to the extent that—

(A) The amount is used, directly or indirectly, by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and

(B) The subsidy is determined, directly or indirectly, by reference to the amount

of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.

**(ii) Indirect subsidies.** A foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that—

(A) Owns or controls, directly or indirectly, the taxpayer or is owned or controlled, directly or indirectly, by the taxpayer or by the same persons that own or control, directly or indirectly, the taxpayer, or

(B) Engages in a transaction with the taxpayer, but only if the subsidy received by such other person is determined, directly or indirectly, by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer with respect to such transaction.

Subsection (f) of the same regulation makes it clear that the person on whom the foreign law imposes liability for the tax is the "taxpayer" in question, even if another person actually remits the tax to the foreign revenue authority. Treas. Reg. § 1.901–2(f).

■ Our case turns on the question whether the income taxes EGPC paid on Amoco's behalf were "taxes paid to a foreign country" within the meaning of § 901(b)(1) and the implementing Treasury Regulations, or if, by force of Treas. Reg. § 1.901–2(e)(2) or (3), those amounts paid do not qualify as "tax paid to a foreign country" either because it was reasonably certain that the monies would be refunded or credited, or because the amounts were indirect subsidies to Amoco. Whether a taxpayer is entitled to foreign tax credits is a question we decide by applying principles of domestic tax law. *Cf. United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 145, 110 S.Ct. 462, 470, 107 L.Ed.2d 449 (1989); *Biddle v. Commissioner*, 302 U.S. 573, 578, 58 S.Ct. 379, 381, 82 L.Ed. 431 (1938). That is not to say that the foreign law is irrelevant, of course; it means only that the ultimate U.S. tax consequences of a particular set of rights and obligations established under foreign law remains a question of U.S. law.

The Tax Court decided that Treas. Reg. § 1.901–2(e)(2) did not deprive Amoco of the right to take a foreign tax credit in this case, because the credit of the Egyptian taxes paid on Amoco's behalf had been made to EGPC rather than to Amoco itself, which meant that Amoco had in fact paid these taxes within the meaning of the regulation. It also concluded that the tax credits to EGPC were not an indirect subsidy to Amoco, because for this purpose EGPC had to be treated as part of the Egyptian government, and it made no sense to say that the Egyptian government was providing a subsidy to itself (*i.e.* EGPC). If the credits were not a subsidy to EGPC, then no party engaged in a transaction with Amoco received the kind of subsidy that would deprive Amoco of its foreign tax credits. The Commissioner naturally urges us to reverse the Tax Court on both counts. Furthermore, she also asks us, assuming we agree with her on these points, to remand the case for a determination of the time as of which EGPC should be deemed to have paid Amoco's Egyptian taxes, and a recalculation of the foreign tax credit Amoco is entitled to based on the adjusted value of EGPC's payments.

### A. *Refund or Credit: Treas. Reg. § 1.901–2(e)(2)*

■ The critical question in determining whether Treas. Reg. § 1.901–2(e)(2) deprives a taxpayer of the right to take a credit for "tax[es] paid to a foreign country" is whether the amount was "reasonably certain" to be refunded, credited, or similarly returned to the taxpayer. We agree with the Tax Court that, under all the circumstances, it was not reasonably certain that the Egyptian Finance Ministry would allow a full credit to EGPC (on its own Egyptian tax returns) for EGPC's payments of Amoco's taxes. The language of Article IV(f)(6) of the MCA was at best ambiguous about the way in which EGPC was to treat these payments: the English version appears to contemplate deductions from income, while the Arabic version may have suggested credits. Given this ambiguity, the Tax Court carefully examined the negotiations leading up to the MCA and the parties' course of dealing under the agreement, and came to the conclusion that Amoco Egypt thought the MCA provided a deduction, EGPC was unsure whether it could take a credit or a deduction, and the

Government of Egypt had no view on the matter. *Amoco v. Commissioner, supra,* 71 T.C.M. (CCH) at 2632–33. Had the parties intended to allow EGPC to take a credit, the court believed the agreement would have been more explicit.

In addition, the court took into account the actual decision of the Egyptian Tax Department (ETD) when it formally reviewed EGPC's returns in 1992. As noted above, the ETD concluded that EGPC was not entitled to take a credit for the taxes it was paying on Amoco's behalf. The consequence of this decision was that EGPC had to pay the back taxes it owed, going back as far as the Egyptian statute of limitations would permit. The Tax Court concluded, and we agree, that a taxpayer could not be "reasonably certain" that it would receive a credit or refund when the governing law did not entitle it to one. *Id.* at 2635. Indeed, if the ETD had begun reviewing EGPC's returns a few years earlier, it would have been entitled to reopen the remaining years at issue in this case. One cannot say that a taxpayer is reasonably certain to obtain a refund or credit just because the taxpayer hopes that the revenue authorities will fail to notice an error until the period of limitations has run. As the Tax Court commented, "[t]he expiration of the period of limitations does not substantively legitimatize the barred action; it simply reflects an inability to enforce the obligation that would otherwise exist." *Id.*

█ The Tax Court also found that, even had there been a refund or credit to EGPC as defined in the regulation, this refund could not be attributed to Amoco. Treas. Reg. § 1.901–2(e)(2) does not contain an "indirect refund" rule analogous to the indirect subsidy concept in § 1.901–2(e)(3), and no one disputes the fact that the ETD did not refund or credit Amoco's Egyptian tax account for as much as a single Egyptian pound. The Commissioner argues at length that the Tax Court cannot be correct, because it is easy to envision circumstances in which a third party pays foreign tax on behalf of a U.S. taxpayer and then receives a refund of that same payment. We do not disagree that this kind of situation can arise, but it seems to us that this is precisely what the indirect subsidy rule of § 1.901–2(e)(3) was designed to cover. The Commissioner loses nothing

by proceeding under subsection (3) of her own regulation, rather than subsection (2), and subsection (3) explicitly includes refunds and credits as types of subsidies. See Treas. Reg. § 1.901–2(e)(3)(i)(A). We therefore agree with the Tax Court that the absence of any refund to the U.S. taxpayer provides an alternate ground for rejecting the applicability of § 1.901–2(e)(2) in this case.

### B. *Indirect Subsidies: § 1.901–2(e)(3)*

█ The more difficult question is whether, even if Amoco's payments did not count as foreign tax payments under the refund regulation, the credits EGPC enjoyed for the closed years were an indirect subsidy to Amoco. On the face of the regulation, this appears to be a strong argument for the Commissioner. First, under this regulation it is clear that a subsidy to another person can be attributed to the U.S. taxpayer, where the other person "[e]ngages in a transaction with the taxpayer" and the subsidy is somehow computed by reference to the amount of the tax or tax base in question. Here, EGPC engaged in a transaction with Amoco, and the subsidy it received (the tax credits) was measured precisely by the amount of tax EGPC was paying on Amoco's behalf to the ETD. "Q.E.D.," says the Commissioner: Amoco received an indirect subsidy because its business partner, EGPC, in effect paid no taxes on its account to the Egyptian government. The Commissioner analogizes this to the Brazilian tax cases, in which this court and a number of other courts found an indirect subsidy to the extent that a fixed percentage of the taxes on interest income paid by Brazilian borrowers was rebated by the government to those borrowers. See *Norwest Corp. v. Commissioner,* 69 F.3d 1404 (8th Cir.1995); *Continental Illinois Corp. v. Commissioner,* 998 F.2d 513 (7th Cir.1993); *Bankers Trust New York Corp. v. United States,* 36 Fed. Cl. 30 (1996); *Nissho Iwai American Corp. v. Commissioner,* 89 T.C. 765, 1987 WL 45300 (1987). The fact that Amoco may have received no economic benefit from the credits EGPC enjoyed (which appears to be the case) is of no importance. See *Norwest,* 69 F.3d at 1408–09; *Continental Illinois,* 998 F.2d at 519–20.

The Tax Court found that the indirect subsidy rule did not apply for a more basic reason. It agreed with Amoco that the EGPC was part of the Egyptian government, and thus by definition it was incapable of receiving a subsidy from itself. It found some support for this notion in Treas. Reg. § 1.901–2(e)(3)(ii), which indicates that indirect subsidies to the U.S. taxpayer occur when a foreign nation provides a subsidy to *another* person. EGPC, recall, is wholly owned and controlled by the Egyptian government; it is affiliated with the Petroleum Ministry; all of its directors are appointed by the government; and their resolutions are subject to the approval of the Minister of Petroleum. Although it has an independent budget, it turns its profits over to the public treasury, and if it were to experience losses the treasury would absorb them. All of that indicated to the Tax Court that no meaningful difference exists between EGPC and the government itself. Amoco argues further on appeal that one should not speak of a "subsidy" unless or until funds move from the government out into the private sector.

Support for Amoco's reading comes from Treas. Reg. § 1.901–2(f)(2)(ii) (Example 3), which clarifies that were a party to enter into a contract with a foreign government directly, whereby that government agreed to assume any tax liability owed itself, the party would remain eligible for foreign tax credits. The Commissioner has attempted to counter this point by referring us to the 1991 regulations, especially Treas. Reg. § 1.901–2(e)(3)(iv) (Example 4) (1991), though it acknowledges those regulations are not applicable to the tax years in question. In this instance we decline to defer to Example 4. It is technically inapplicable, and we note that it was drafted during the pendency of this case and bears the marks of a litigating position. *Cf. First Chicago NBD Corp. v. Commissioner,* 135 F.3d 457, 1998 WL 28113, at *1–2 (7th Cir. Jan.28, 1998); *Pennington v. Didrickson,* 22 F.3d 1376, 1383 (7th Cir.1994). (Were the regulation applicable we would consider it despite this latter concern, as it was promulgated through notice-and-comment rulemaking. See *Indianapolis Life Insurance Co. v. United States,* 115 F.3d 430, 436 (7th Cir.1997), citing *Smiley v. Citibank (South Dakota) N.A.,* 517 U.S. 735, 739–41, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996).)

The question of how to treat state-owned enterprises or instrumentalities is exceedingly complicated. The one thing that can be said with confidence, however, is that the Supreme Court has eschewed bright-line rules in favor of a more functional approach to the matter. As an initial matter, we think it overstates the case to say that EGPC has *no* separate identity from the Government of Egypt. As the Supreme Court pointed out in *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec*"), governments often create instrumentalities to carry out specific purposes:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Id.* at 624, 103 S.Ct. at 2599. Nevertheless, although the Court also said that principles of comity normally require foreign governments to respect the separate existence of the instrumentalities of other States, *id.* at 626–27, 103 S.Ct. at 2599–2600, in *Bancec* itself the Court chose to look beyond Bancec's separate juridical personality to the Government of Cuba, which in turn permitted Citibank to obtain a setoff against the amounts the plaintiff Bancec claimed were due to it under a letter of credit. *Id.* at 632–33, 103 S.Ct. at 2602–03.

Whether one is looking at an instrumentality of a foreign government, which is suable in U.S. court under the provisions and limita-

tions of the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1330, 1602–1611, or one is looking at an instrumentality of the U.S. government, the kind of legal issue presented and the context of the suit has been more important than the label "governmental" or "non-governmental." Thus, for example, in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), the Supreme Court decided that the National Railroad Passenger Corporation, commonly known as Amtrak, was part of the Government for purposes of the First Amendment to the U.S. Constitution, notwithstanding language in the enabling legislation that expressly said that the corporation was "not ... an agency or establishment of the United States Government." *Lebron*, 513 U.S. at 391, 115 S.Ct. at 970, quoting 45 U.S.C. § 541 (1994), since recodified to 49 U.S.C. § 24301(a)(3) ("[Amtrak] is not a department, agency, or instrumentality of the United States Government."). The statute creating Amtrak assigned it particular governmental goals; six of its eight externally named directors were appointed directly by the President, and the government's control was essentially perpetual.

Nevertheless, for other purposes the statutory declaration that Amtrak is not an agency or instrumentality of the United States continues to have force. This court held in *Hrubec v. National Railroad Passenger Corp.*, 49 F.3d 1269 (7th Cir.1995), that employees of Amtrak are not "employees of the United States" for purposes of the statute punishing unauthorized disclosures of an individual's income tax return, 26 U.S.C. § 7431. And Amtrak is not alone; the Red Cross, for example, is intermittently viewed to be a part of the government. See *United States v. City of Spokane*, 918 F.2d 84, 88 (9th Cir.1990) (Red Cross an instrumentality of United States Government for purposes of tax immunity, despite not being such for purposes of the Freedom of Information Act, distinguishing *Irwin Memorial Blood Bank v. American Nat'l Red Cross*, 640 F.2d 1051 (9th Cir.1981)); *Hall v. American Nat'l Red Cross*, 86 F.3d 919, 922 (9th Cir.1996) (Red Cross not subject to Religious Freedom Restoration Act, distinguishing *City of Spokane*). See also *Clark v. County of Placer*, 923

F.Supp. 1278, 1283 (E.D.Cal.1996) (private corporation created to run county racetrack treated as county government); *Sullivan v. United States*, 21 F.3d 198 (7th Cir.1994) (Public Defenders covered by Westfall Act immunity from suit).

Given this general approach to government instrumentalities, we do not find dispositive the fact that the Treasury Regulations on which the Commissioner relies define the term "foreign country" to mean "any foreign state, ... and any political subdivision of any foreign state...." Treas. Reg. § 1.901–2(g)(2). Persons familiar with the FSIA will notice immediately the difference between that definition and the definition that governs the amenability of foreign governments to suit in U.S. court, which says "[a] 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). An agency or instrumentality, in turn, is an entity that is a separate legal person, either an organ of the foreign state or one of its political subdivisions or a majority of whose shares is owned by the foreign state or a political subdivision, and which is neither a citizen of a State of the United States nor of a third country. 28 U.S.C. § 1603(b). Thus, if the question before us were whether EGPC itself could be sued in U.S. court, the answer would certainly be that it could be sued only under the FSIA, with the attendant protections and rules the FSIA provides for suits against foreign sovereigns.

Since that is not the question, however, we must decide whether an indirect subsidy to an instrumentality of a foreign government is functionally a transfer within the government itself, even though "instrumentalities" are not included in the regulatory definition of the term "foreign country." Even more narrowly, we must decide whether EGPC's status as an instrumentality of the Egyptian government means that the credit given against its own taxes deprives Amoco of its foreign tax credit. We need not decide whether it is impossible in all circumstances for a government to grant a subsidy to one of its wholly or majority owned enterprises,

because issues relating to subsidies arise in other contexts as well. See, *e.g.*, Tariff Act of 1930, 19 U.S.C. §§ 1671 *et seq.* (describing when countervailing duties may be imposed against imports that have benefitted from foreign government subsidies). It is enough here to focus on the question of tax law that is presented.

Amoco argues that the odd situation here, where the benefit conferred on EGPC is a fluke of the operation of Egypt's statute of limitations, cannot give rise to a "subsidy" for purposes of § 1.901–2(e)(3), because Egypt's action was inadvertent. The dictionary definition of "subsidy," it reminds us, normally implies some kind of intentional disbursement. See Black's Law Dictionary 1428 (6th ed.1990) ("[a] grant of money made by government in aid of the promoters of any enterprise ... in which the government desires to participate, or which is considered a proper subject for government aid"); Webster's Third New International Dictionary 2279 (1993) ("1. something *intended* to aid, support or comfort; 2. a *grant* or *gift* of money or other property made by way of financial aid") (emphasis added, first definition considered archaic). It seems to us that we must go beyond the dictionary level of analysis to resolve such an important question. Amoco may be right that the term "subsidy" often implies an intention to confer a benefit, but it does not always carry that meaning. We note, for example, that the World Trade Organization's Agreement on Subsidies and Countervailing Duties defines a subsidy very broadly, as "a financial contribution by a government or any public body within the territory of [that country]," which includes a direct transfer of funds, potential direct transfers of funds or loan guarantees, forgiveness of required payments (including tax credits), and provision of goods or services, as long as a benefit is thereby conferred on the recipient. See Agreement on Subsidies and Countervailing Measures, Article 1, § 1.1, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, *reprinted in* The Results of the Uruguay Round of Multilateral Trade Negotiations—The Legal Texts 264 (1994). Although we express no view on the question, one could argue that the Agreement includes both deliberate and inadvertent sub-sidies. More importantly, we are exceedingly reluctant to embrace a definition of "subsidy" for tax purposes that would require the IRS to show in every case that the public body in question "intended" to confer a benefit. That kind of inquiry is notoriously difficult to conduct, and without far stronger support than we find here, it is better avoided. *Cf. Continental Illinois*, 998 F.2d at 520.

We return, therefore, to the twin facts that EGPC is an instrumentality of the Egyptian government (though not "the country" itself) and that it was the sole entity that received the benefit of the (erroneous) tax credit. In our view, both of these facts are relevant to the question of characterization we face: under all the circumstances, should EGPC be treated as part of the government of Egypt, or as a separate and distinct entity? Under EGPC's corporate structure, as described above, it is perfectly clear that any benefit to EGPC is a benefit to the government of Egypt, and vice versa: EGPC's profits go straight to the treasury, and it would never feel any losses, because the treasury would absorb them. EGPC is therefore not subject to conditions of demand and supply in the same way an ordinary taxpayer is.

EGPC's financial relationship with the government is significant when we consider the reason that lies behind the IRS's choice of a bright-line rule for indirect subsidies, under which the indirect subsidy will prevent a taxpayer from taking the foreign tax credit even if the business partner who received the subsidy directly does not pass along any of the benefit to the taxpayer. We pointed out in *Continental Illinois* that a rule requiring the IRS to figure out in every case who gets how much of the benefit of a subsidy would lead to "interminable investigation of the mysteries of public finance." 998 F.2d at 520. This is because the task would involve figuring out how much of the benefit was retained by the direct recipient of the subsidy and how much was passed on to the U.S. taxpayer. Compare *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (rejecting indirect purchaser standing for antitrust cases). Here, however, the opposite problem looms just as large. If the government itself agrees to assume

any tax liability owed, the U.S. party remains eligible for foreign tax credits. Treas. Reg. § 1.901–2(f)(2)(ii) (Example 3). How are we to tell under the particular relationship that obtains between the government of Egypt and EGPC how much of Amoco's tax liability was actually assumed by EGPC and how much was absorbed by the government? The government of Egypt can receive a greater amount of EGPC's taxes today (if EGPC deducts Amoco's tax payment) and a smaller amount of profit at the end of the year, or it can receive slightly less today (if EGPC takes a credit) and more profit at the end of the year. One way or the other, however, the economic reality of this transaction is identical to that of Example 3, and differs from a case in which a government confers a benefit on a business partner of the taxpayer that does not have EGPC's characteristics.

From an economic standpoint, Amoco was paying its taxes to the government of Egypt, no matter how many hands the money later passed through. The percentage of production to which Amoco was entitled under the MCA was less than it otherwise would have been, to account for the fact that EGPC would be responsible for Amoco's Egyptian taxes. Recall that Amoco was entitled to 20% of the crude oil produced as reimbursement for its costs of exploration, production, and related operations, and the remaining 80% was split between EGPC and Amoco approximately 85% to 15%. The latter split reflected EGPC's responsibility for royalties on the oil produced and for Amoco's taxes. Further, Amoco's declared income to both the Egyptian and U.S. government was "grossed up," that is included as additional income EGPC's tax payments on Amoco's behalf, and the MCA noted this requirement and noted that Amoco owed Egyptian income taxes on these payments.

In a sense, Amoco paid its Egyptian taxes as soon as it turned over the oil it produced to EGPC as an agent for the Egyptian government. EGPC was then required to turn the payment over to the ETD, which it did. The ETD documented the amounts of the payments, which Amoco then used as evidence of the amount of the foreign tax credit to which it was entitled on its U.S. tax returns. Whether the ETD later sent the money back to EGPC, or shuttled it to the Suez Canal, or used it on Nile River preservation efforts, means nothing from Amoco's point of view. We are obviously not saying that Amoco could have estimated the amounts of its tax payments directly from the production sharing agreement or otherwise disregarded the formal act of paying the ETD. We are making the far different point that Amoco unquestionably bore the economic burden of the taxes imposed on its operations by Egypt. This means that it does no violence to the tax laws to construe them as allowing Amoco to take the foreign tax credit under these circumstances.

Our decision to treat EGPC and the Egyptian government as a single entity in this situation is no different from the way U.S. law occasionally treats the United States and its individual agencies. For example, when monies are owed to an individual by one agency, and the individual has debts to another, the different agencies may set off the debts owed by one agency against claims that another agency has. See 31 U.S.C. § 3716(a); *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *In re Turner*, 84 F.3d 1294 (10th Cir.1996) (en banc). We therefore hold that for tax purposes the Government of Egypt and EGPC should be treated here as a unitary entity, even if in other contexts it would be appropriate to recognize EGPC as a separate corporate body.

### C. *Computation of Dollar Value of Taxes*

Given our resolution of the Commissioner's principal claim in Amoco's favor, we also reject the Commissioner's argument that a remand is necessary to allow the Tax Court to compute the extent to which the dollar value of EGPC's 1992 and 1993 payments of back Egyptian taxes on its own account corresponds to the value of the foreign tax credits Amoco claimed on its U.S. tax returns. The Commissioner has never disputed that EGPC paid Amoco's taxes to the ETD in each year when they were due. EGPC's later payments simply resolved its own tax situation under Egyptian law. For the reasons we have already set forth, this

internal Egyptian governmental issue does not affect Amoco's foreign tax credits.

For these reasons, we AFFIRM the judgment of the Tax Court.