GRIFFITH, Circuit Judge,
dissenting:
I share the majority’s frustration with this, the' latest of what seems to have become a judicial mini-series, “Riggs VI: Return of the Subsidy.” We are unanimous in the hope that it is the last of the sequels. We disagree, however, about what our role in this case should be, and I think it a disagreement worthy of some discussion. While I share my colleagues’ *130 unease over PNC’s “stratagem for avoiding U.S. taxes,” Op. at 128, such discomfort alone cannot determine the outcome of a case. Both facts and law are fundamental to our conclusions, and although the facts of this case are complicated, the law is simple. This case turns entirely on the plain language of controlling U.S. tax regulations. That language is clear, unambiguous, and dispositive. Its effects — whatever they may be — are not within our power to forestall, and its neutral application does not, as the majority suggests, create any inconsistency. On the contrary, our abandonment of a textual approach creates inconsistencies galore, putting us conspicuously at odds with the text of both U.S. and relevant Brazilian law, our own precedent, and the reasoned decision of a sister circuit. The court’s analysis also obscures two important principles it seeks to clarify: the act of state doctrine and the law-of-the-case doctrine. Accordingly, I dissent.
I.
The text of controlling law requires our disposition in favor of PNC. We are reluctant to disregard an agency’s interpretation of its own regulation “unless an alternative reading is compelled by the regulation’s plain language.... ” Air Transp. Ass’n of Am., Inc. v. F.A.A., 291 F.3d 49, 53 (D.C.Cir.2002) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)) (internal quotation marks omitted). In this case, the plain language of the relevant Treasury regulation is sufficient to compel an alternative reading. The question for the court is whether foreign tax credits properly claimed by PNC should be reduced by the amount of subsidy payments made by the Brazilian government to the Central Bank of Brazil. See Riggs Nat’l Corp. & Subsidiaries v. Comm’r, 295 F.3d 16, 22-23 (D.C.Cir.2002) (Riggs TV) (remanding this issue to the Tax Court). The controlling provision of law is Treas. Reg. § 1.901 — 2(e)(3)(ii) (1984),[1] which provides in relevant part that a payment constitutes a “subsidy” only if it is paid by a “foreign country” to “another person.” The resolution of this appeal thus depends on whether the Brazilian government (a “foreign country”) has made payments to “another person” within the meaning of Treas. Reg. § 1.901-2(e)(3)(ii). Our sole task is to determine whether the Central Bank is “another person” for the purpose of the relevant regulation. See Op. at 125.
Given the ample amount of judicial ink put to paper concerning the relationship between and among Riggs Bank, the Central Bank of Brazil, and the government of Brazil, our analysis need not be labored. It is uncontested, as the court observes, that the Central Bank is “100% a part of Brazil’s federal government,” id. at 121, “government-controlled,” id. at 120, and “required [by Brazilian law] to act on behalf of Brazil’s government and prohibited from acting on behalf of anyone else,” id. at 121. And yet the court simultaneously contends that the Brazilian government and the Central Bank of Brazil are “distinct,” see id. at 127, and concludes that the Central Bank “stood in for [borrowers-to-be] when it received ... tax payments back in subsidies,” id. at 127. I disagree. The answer to the question before us is apparent: The Central Bank is unquestionably part of a “foreign country” and therefore not “another person.” No one disputes that Riggs’s taxes have been retained by the Brazilian government. The *131 functional transfer of funds within a government is not a transfer to “another person.” The regulations confirm this conclusion by clarifying that when a subsidy is paid to a “political subdivision” of a foreign state issuing the subsidy, the subsidy is paid to the “foreign country” itself. Treas. Reg. § 1.901 — 2(g)(2). I fail to see ambiguity in this text that would permit any alternative conclusion.
Even my colleagues agree that, “in a vacuum,” our disposition ought to be self-evident. See Op. at 125 (“[W]e might well answer [the question] as PNC proposes. There is, after all, no' denying the Central Bank’s part-to-whole relationship to the Brazilian government.”). But the court, perhaps frustrated by the outcome that this straightforward analysis of the text and neutral application of law requires,[2] struggles to justify the opposite result. Observing that “we do not operate in a vacuum,” id. at 125, the court concludes that a decision in favor of PNC would ratify an intolerable inconsistency, see id. at 125. Again, I disagree. On the contrary, the court, in trying to restore clarity to the confusing legal interpretation of a foreign minister (and, perhaps, in its attempt to reach what it deems a just end to a troubling case), has contorted what precious little logic remains available to us and, in so doing, has overstepped the limits of its authority.
II.
The majority’s error flows from its mistaken effort to impose consistency on the reasoning of a foreign state — specifically, the dubious conclusion that the Central Bank stood in for borrowers-to-be when it paid PNC’s taxes, see id. at 127. From my colleagues’ perspective, it is not possible to conclude that the Central Bank was compelled to pay taxes to the government of Brazil without also concluding that the Central Bank acted in the place of borrowers-to-be and is, therefore, “another person” for the purpose of our tax law. The majority observes that “[when it was compelled to] remit tax payments on PNC’s behalf, standing in for the borrowers-to-be ... the Central Bank was distinct from the Brazilian government. Thus, as the payment and the subsidy are both part of the same indivisible transaction, Riggs II necessarily implies the Central Bank is likewise distinct for purposes of the subsidy.” Id. at 127 (emphasis in original). But in fact we specifically held otherwise in Riggs National Corp. & Subsidiaries v. Commissioner, 163 F.3d 1363 (D.C.Cir.1999) (Riggs II), declining to conclude that the Central Bank of Brazil was distinct from the government of Brazil, much less that it acted in the place of borrowers-to-be. Such a conclusion would not have been supported by law, nor by logic. As the court itself notes, the Central Bank is “required to act on behalf of Brazil’s government and prohibited from acting on behalf of anyone else.” Op. at 121.
Ironically, my colleagues’ disregard for the logical flaws in the Minister’s reasoning is animated by their desire to circumvent what they misconceive to be another logical problem: how this court, in Riggs II, could have deferred to a conclusion if that conclusion were based on a false premise. In other words, how could we have deferred to an act of state (ie., the order that the Central Bank pay taxes on *132 PNC’s income) without having accepted, “by necessary implication,” see Op. at 126, 127, the reasoning offered to justify the state act (ie., that the Central Bank stood in for borrowers-to-be)? But this is no logical problem at all. We deferred to the act because the act of state doctrine compelled us, regardless of the underlying premise. That is the purpose of the doctrine, which precludes us from “inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory,” Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), and the nature of deference, which precludes us from “sit[ting] in judgment on the acts of the government of another done within its own territory,” Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). The fact that the Minister of Finance “looked through” the Central Bank for the purposes of deciding the proper tax treatment of loans, see Riggs II, 163 F.3d at 1366, does not require that we base our own conclusions on the result of that awkward analysis. Had the Minister of Finance based an order on his observation that the sky is orange, we would still defer to the order, regardless of the reasoning. No implications, therefore, “necessary” or otherwise, fell out of our decision that the Central Bank paid taxes on behalf of PNC other than the fact that PNC could claim foreign tax credits in the amount of those taxes.
I agree that “in the interest of consistency, we need [to] adhere ... to the necessary implications of Riggs II.” Op. at 127. But that is not what the court has done. Instead — and contrary to its own representation (“We cannot ignore the holding in [a previous case] and consider the facts de novo.” Op. at 125) — the court has adopted, de novo, the interpretation of a foreign official that contravenes the text of foreign law (an observation that both the Commissioner and the tax court have shared). (“[T]he Central Bank, under Brazilian law, was constitutionally immune from having to pay withholding tax with respect to its net loan interest remittances abroad.” Riggs Nat’l Corp. v. Comm’r, 107 T.C. 301, 355 (1996) (Riggs I), rev’d on other grounds, Riggs II, 163 F.3d 1363.) This is precisely the error we avoided in our previous holding. (“We are ... hesitant to treat an interpretation of law as an act of state, for such a view might be in tension with rules of procedure directing U.S. courts to conduct a de novo review of foreign law when an issue of foreign law is raised. See Fed.R.CivP. 44.1; Tax Court R. 146.” Riggs II, 163 F.3d at 1368.) The act of state doctrine did not compel our deference to the legal interpretation of a foreign state and therefore offers no support for the majority’s conclusion. Nor does our holding in Riggs II bolster the court’s conclusion that we are bound by the law of this case to abandon our unanimous plain language interpretation of controlling law. Nor has the court offered any analysis to support its novel conclusion that the Central Bank should be considered to have acted on behalf of borrowers-to-be despite the explicit prohibition against acting on behalf of anyone but the government of Brazil. See Op. at 121. In fact, the majority admits to being puzzled (as am I) by how, even “if it were legally possible for the Brazilian government to impose a tax on its Central Bank ... it would be economically possible for the Central Bank to pay it: At most, the money would go from the Brazilian government’s right pocket to its left.” Id. Precisely. It is similarly puzzling to suppose that when the Brazilian government pays subsidies to the Central Bank, it is doing anything more than the same motion in reverse. Why then are these two halves of the same transaction, occurring simultaneously, treated differently? Because an act of state compelled us to recognize the *133 first half (i.e., mandatory payment of tax) while no such act compels our recognition of the second half (ie., payment of subsidy). Whereas we were obliged in Riggs II to accept the fact that the Central Bank had been compelled to pay taxes (despite all evidence to the contrary), we were not (nor are we now) obliged to accept the argument that the Central Bank stood in the place of borrowers-to-be and is therefore “another person” for the purpose of our tax law. It was our required deference in one case, not required in another, that accounts for our “disparate treatment to two legs of a simultaneous transaction,” see id. at 125, which, frustrating though it may be to those who dislike the outcome, is not at all inconsistent.
III.
Far from being “indifferent to all context and background” in this case, Op. at 129, I am mindful of our duty to respect the effect of our previous holdings and the bounds of our role in this case. I also share my colleagues’ interest in policing inconsistency in our jurisprudence, see id. at 125, and therefore find myself motivated by the same concerns expressed by the court, but reach the opposite conclusion. I believe that the court’s analysis has ignored conclusive authority, created inconsistencies where none need exist, and ultimately put us at odds with (1) the plain language of U.S. law, (2) our own precedent in this case, and (3) the reasoned analysis of a sister circuit.
First, the court’s decision ignores the language of the controlling U.S. tax regulation. The plain meaning of “another person” is clear, despite the majority’s initial interpretation of that dispositive phrase. See id. at 125 (“Read in isolation, § 1.901-2(e)(3) ... appears to ask whether the recipient is the taxpayer.” (emphasis in original)). The words “another person” are most naturally read — both in isolation and in the relevant context — to mean a third party that is neither the foreign government nor the U.S. taxpayer. Thankfully, this is not a source of disagreement, as the majority ultimately concludes that “for purposes of this appeal ... [another person] is a person other than the Brazilian government,” and “[t]here is, after all, no denying the Central Bank’s part-to-whole relationship to the Brazilian government.” Op. at 125.
A textual approach to the case would therefore seem appealing, not only because of the clarity it offers, but also because the relevant regulations did not, at the time of their effect in this case, permit a functional analysis of whether the “subdivision” of a “foreign country” was in fact part of the foreign country. Instead, the Internal Revenue Service created a bright-line rule to govern the categorization of indirect subsidies. That rule, as our sister circuit has noted, was intended to save the Service from the “interminable investigation of the mysteries of public finance.” See Cont’l Ill. Corp. v. Comm’r, 998 F.2d 513, 520 (7th Cir.1993) (Posner, J.). If an alternative mechanism were preferable, it was for the Service to create, not for us to impose. There is nothing in the regulations to support the view that a “subdivision” of a “foreign state” can be part of the “foreign country” in some cases but not others. Indeed, the regulations state the contrary, defining “foreign country” as “any foreign state ... and any political subdivision of any foreign state.... ” Treas. Reg. § 1.901 — 2(g)(2); see also Amoco Corp. v. Comm’r, 138 F.3d 1139, 1147 (7th Cir.1998).
The decision of this court is therefore at odds with the plain language of relevant law, creating a troubling inconsistency between our jurisprudence and the controlling text of a regulation. If the Commissioner is frustrated by a loophole that exists in the agency’s regulations, he *134 need only correct it or request that Congress amend the statute.[3] We may not enforce such corrections retroactively. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (“Retroactivity is not favored in the law. Thus ... a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.”).
Second, the court’s analysis is inconsistent with our own precedent in this case. The majority asserts that we are bound by the law-of-the-case doctrine (“[T]he same issue presented a second time in the same case in the same court should lead to the same result” Op. at 126 (quoting LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C.Cir.1996) (en banc) (emphasis in original))) and that “[t]he identity or non-identity of the Central Bank and the Brazilian government for purposes of the tax arrangement in this case was decided by necessary implication in Riggs II.” Op. at 126. I disagree and believe that the majority has misinterpreted our decision in Riggs II, which was specifically and explicitly limited to address whether or not the Central Bank had been compelled to pay taxes on Riggs’s income. The issue in that case was whether Riggs was “legally liable for the tax under Brazilian law.” Riggs II, 163 F.3d at 1363 (internal quotation marks omitted). The result in that case was that the Minister’s order to the Central Bank to make tax payments on behalf of Riggs was presumptively valid, see id. at 1368; Riggs IV, 295 F.3d at 18, or as the majority puts it, “American courts must accept as given that the Brazilian government levied a compulsory payment on the Central Bank — period.” Op. at 127. That is the extent of the result in that case. The law-of-the-case doctrine compels our deference only to that previous judicial conclusion, and not to the incongruous legal interpretations of a foreign state that we have previously disavowed. See Riggs II, 163 F.3d at 1368 (declining to apply the act of state doctrine to a foreign state’s interpretation of law in light of our obligation to interpret law de novo).
In support of its law-of-the-case argument, the court suggests that Riggs II can be read to include the Minister’s “borrowers-to-be” rationale as part of its holding because it “restated the Minister’s order in such a way as to incorporate [its rationale]-” Op. at 127. It then quotes Riggs II as evidence of its theory: “[T]he Minister ... ordered that the Central Bank must, in substitution of the ... [borrowers-to-be], pay the income tax....” Id. (internal quotation marks omitted) (citing Riggs II, 167 F.3d at 1368). But the original language of Riggs II is as follows:
[W]hether or not it can be said that the Brazilian Minister of Finance’s interpretation of Brazilian law qualifies as an act of state, the Minister’s order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. The Minister, after all, ordered that the Central Bank “must, in substitution of the future not yet identified debtors of the tax ... pay the income tax on the interest paid during the period in which the funds remained available for relending.” Riggs, 107 T.C. at *135 331. Such an order has been treated as an act of state.
Riggs II, 163 F.3d at 1368 (emphasis added). The language we quoted in Riggs II was not even the Minister’s language. It was excerpted from the Opinion of the Acting Secretary of the Brazilian tax authority, upon which the Minister based his order. In fact, the actual language of the Minister’s order was much more concise:
I agree fully with the conclusions of the attached opinion of the . ■.. [Brazilian IRS]. In view of item 13 of said opinion, I direct the Central Bank of Brazil to implement the payment of income tax on or before the last business day of the month following the month in which the withholding is made.
Riggs I, 107 T.C. at 329. Our decision in Riggs II to quote language from the opinion upon which the Minister’s order was based does not imply, much less demonstrate, that our deference in that case extended to the reasoning behind the act of state. The court errs when it fixes its attention on the contents of a state authority’s legal opinion, see Op. at 127 (“[The foreign ruling] has three parts: the bare imperative, the borrowers-to-be-rationale, and a broader discussion of the Central Bank’s legal situation in various types of financial transactions.”), rather than the state’s act (“I direct the Central Bank of Brazil to implement ... payment....” Riggs I, 107 T.C. at 330 (internal quotation marks omitted)). The act of state has only one part: the official demand of payment. Particularly in light of our own language in Riggs II describing the Minister’s order “to withhold and pay the income tax on the interest paid,” id. at 1368, as well as the surrounding discussion, which I read to be contemplative of the very scenario now before us, I cannot agree with the majority that we ever intended to include the borrowers-to-be reasoning in our understanding of what the act of state included. Our language in Riggs TV further confirms my view when it describes our holding in Riggs II, in which “we held that the Minister of Finance’s ruling that the Central Bank was obligated to pay the taxes was an act of state, which precluded the Commissioner from inquiring into its validity.” Riggs IV, 295 F.3d at 18 (emphasis added).
The court’s conclusion that the Central Bank’s role (i.e., “standing in for the borrowers-to-be,” Op. at 127) is defined by the “necessary implication” of our previous limited holding is therefore unsupported and the majority now rests its entire decision on the faulty reasoning we have hitherto disclaimed. In so' doing, the court turns the Tax Court’s error in Riggs I on its head. In Riggs I, the Tax Court ignored the Minister’s ruling and instead conducted -its own investigation of Brazilian tax law. We corrected the error by clarifying that a U.S. court may not invalidate a foreign sovereign’s official act within its own territory. The-tax court had not been appropriately deferential. The approach advocated today by the majority goes too far in the opposite direction by requiring our deference not only to a sovereign’s official act, but also to the underlying reasoning. This is a misapplication of the act of state doctrine, which is meant to prevent the courts of one sovereign from examining the validity of the acts of another because doing so “would very certainly imperil the amicable relations between governments and vex the peace of nations.” Oetjen v. Cent. Leather Co., 246 U.S. 297, 304, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (internal quotation marks omitted). As the Court made clear in Underhill v. Hernandez, “[r]edress of grievances by reason of [acts of state] must be obtained through the means open to be availed of by sovereign powers as between themselves.” 168 U.S. at 252, 18 S.Ct. 83. Just as the appropriate audience for frustration at the controlling language of the Treasury regulations is Congress and the Internal *136 Revenue Service, the appropriate audience for frustration at Brazil’s order is the Executive.
Third, and finally, the majority’s analysis is inconsistent with the decision of our sister circuit, and therefore creates a split from the Seventh Circuit’s determination in Amoco. In that case, both the Tax Court and the Seventh Circuit held that a government entity could not receive a subsidy from that same government. See Amoco, 138 F.3d at 1146 (citing Tax Court’s interpretation of Treas. Reg. § 1.901 — 2(e)(3)(ii), “which indicates that indirect subsidies to the U.S. taxpayer occur when a foreign nation provides a subsidy to another person” (emphasis in original)). The Amoco court based its conclusion on the seemingly uncontroversial observation that it is impossible for a foreign government to subsidize itself. See id. at 1148-49. Although we are not bound by the Seventh Circuit’s holding, “we avoid creating circuit splits when possible.” United States v. Philip Morris USA Inc., 396 F.3d 1190, 1201 (D.C.Cir.2005.). This may be particularly true in a case involving federal tax law, where “uniformity among the circuits is particularly desirable ... to ensure equal application of the tax system,” Wash. Energy Co. v. United States, 94 F.3d 1557, 1561 (Fed.Cir.1996) (internal quotation marks omitted), and to further maintain consistency.
Of greater concern than our departure from the views of a sister circuit in a similar case, however, is our departure from the logic that undergirds both Amoco and the case before us. Key to the Amoco court’s analysis of whether a subsidy was paid to “another person” was whether the “benefit” of the subsidy was retained by the foreign government that had paid it. See Amoco, 138 F.3d at 1148-49; see also Riggs Nat'l Corp. & Subsidiaries v. Comm’r, No. 24368-89, slip op. at 38 n. 12, 2004 WL 938295 (T.C. May 3, 2004) (recognizing the necessity of a benefit analysis in determining whether a subsidy is an “indirect subsidy” for the purposes of the Treasury regulations).[4] If the benefit of the subsidy is retained by the foreign government, then it should not be treated as a subsidy for the purpose of the Treasury regulations.
My colleagues acknowledge that the purpose of the subsidy provision in U.S. tax law is to avoid double taxation. See Op. at 120. They fail to demonstrate, however, how a decision in favor of PNC would offend this purpose. They claim that “[t]he IRS ends up on the wrong end of the see-saw.” Id. at 122. But whether or not the IRS ends up on the wrong end of the see-saw is not our concern. We have no authority over that playground. It is undisputed that the Central Bank received and retained the benefit of the subsidy. The majority has failed to cite any record evidence to the contrary. If the benefit of the subsidy paid by Brazil is retained by Brazil, then it should not be treated as a subsidy for the purposes of the Treasury regulations. See, e.g., Amoco, 138 F.3d at 1148.
The court distinguishes Amoco by listing factual differences between the cases. See Op. at 129 (“Amoco lacked every factual feature we have found decisive in this appeal: no tax immunity, no private letter ruling or equivalent, no borrowers-to-be or analogue for them, and no controlling precedent.”). None of these features compels a different decision. If anything, they strengthen the case for PNC. The Central Bank’s tax immunity demonstrates its economic identity with the government of Brazil — a characteristic that weighs *137 strongly in favor of PNC: The private letter ruling explains why in Riggs II we allowed PNC to claim foreign tax credits— a determination that would otherwise seem surprising at best. The borrowers-to-be are irrelevant to the analysis favored by the Amoco court, as no borrowers-to-be retained the benefit of subsidies. And, as I have discussed, our precedent in this case does not compel our endorsement of the suspicious rationale put forth by the Minister of Finance — indeed, it counsels our reluctance . to adopt that reasoning.
IV.
Our previous holdings in .this line of cases allowed Brazil to place an artificial tax liability on its own Central Bank and thus exploit a domestic tax loophole for the benefit of Riggs Bank. Regretful about the consequences of our holding, we nonetheless recognized that the remedy sought by the Commissioner was not ours to provide: “Of course, the opportunistic nature of the Brazilian government’s action is particularly vexing.... But although we can visualize prophylactic regulatory measures ... the Commissioner has not yet fashioned a legitimate legal challenge to Riggs’s use of the foreign tax credit in this case.” Riggs II, 163 F.3d at 1369. PNC’s attempt to take advantage of the Treasury regulations by virtue of our previous decision is similarly vexing. And similarly, although we can easily visualize prophylactic regulatory measures (which have in fact since been implemented), the Commissioner has again failed to request relief that a court can provide. If an act of state is objectionable, it is for the Executive to contest. If laws are flawed, they are for Congress to improve.
I respectfully dissent.

. "A foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that ... [ejngages in a transaction with the taxpayer.” Treas. Reg. § 1.901 — 2(e)(3)(ii).

. "[E]very previous court to address [this] issue has regarded PNC’s tax arrangement in Brazil as a stratagem for avoiding U.S. taxes.” Op. at 128. Although I am sympathetic to the court’s reluctance to tolerate what it senses to be unfair play, we do not referee fairness. We construe law. As Thomas More observed in A Man for All Seasons, “1 know what’s legal not what’s right. And I’ll stick to what’s legal.” Robert Bolt, a Man for All Seasons 65 (Vintage International Ed. 1990).

. Indeed, it would appear that the loophole that gave rise to Riggs's petition in this case has been appropriately remedied by Congress. The current regulations, revised in 1991, eliminate the phrase "another person" and provide that an amount is a subsidy if it is provided “to any person (governmental or not).” Treasury Decision 8372, 1991-2 C.B. 338 (emphasis added); see also Op. at 125 n. 5.

. Although I have noted that a functional approach to the relevant regulatory language is disfavored in this case, the fact that the court's analysis contravenes both textual and functional approaches bears notice.