FIRST CHICAGO CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
First Chicago Corp. v. Commissioner
Docket No. 11174-87
United States Tax Court
T.C. Memo 1991-44; 1991 Tax Ct. Memo LEXIS 63; 61 T.C.M. (CCH) 1774; T.C.M. (RIA) 91044; February 5, 1991, Filed *63 John Lindsey Snyder and Marilyn D. Franson, for the petitioner. Beth L. Williams and Michael Boman, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 3,933,041 in petitioner's Federal income tax for 1983. The matter considered herein (which was severed from the other matters in the case) concerns petitioner's entitlement to foreign tax credits for Brazilian withholding taxes on interest income received by petitioner's principal subsidiary, First National Bank of Chicago (FNBC), on net loans made to Brazilian borrowers. Pursuant to the terms of a net loan, the borrower is contractually obligated to pay all Brazilian taxes due on interest paid to the lender (here, FNBC). During the years involved, the Brazilian borrowers received subsidies from the Brazilian Government equal to a percentage of the taxes withheld on the interest tendered. The issues for decision with respect to the severed matter are: (1) Whether any part of the Brazilian withholding taxes is a creditable foreign tax under section 901; [1] and if so, then (2) whether the subsidies the Brazilian Government paid to Brazilian *64 borrowers should reduce the amount of the foreign tax credit. These issues are the same as those we confronted in the consolidated cases of Continental Illinois Corp. v. Commissioner, T.C. Memo 1988-318, affd. without published opinion sub nom. Citizens and Southern Corp. and Subsidiaries v. Commissioner900 F.2d 266 (11th Cir. 1990) (herein sometimes referred to as the Continental Illinois case), and in Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765 (1987). Respondent concedes that to the extent the Brazilian foreign tax credits are disallowed, petitioner will be entitled to a corresponding reduction of its reported interest income. All other issues in this case were either settled or tried before Judge Joel Gerber at a special trial session in Chicago, *65 Illinois. FINDINGS OF FACT The parties stipulated that the record in this case is to include the record in the Continental Illinois case. Substantially all of the facts in this case have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Background
Petitioner is a bank holding company with its principal place of business in Chicago, Illinois. It filed consolidated Federal income tax returns on a calendar year basis with the I.R.S.Kansas City, Missouri, Service Center. FNBC, a national banking corporation, is a wholly owned subsidiary of petitioner. FNBC has engaged in the banking business since 1863. Between 1978 and 1983, FNBC regularly made loans to borrowers located in foreign countries, including Brazil. Brazilian Regulation of Foreign Lending
Brazil imposes restrictions on the receipt and exchange of foreign currency. By law, the Banco Central do Brazil (Central Bank) must register and approve all loans from foreign lenders to Brazilian borrowers. Through the registration process, the Central Bank set the range of acceptable interest rates and periodically established the minimum *66 repayment terms of loans. Once the Central Bank approved a loan, the lender remitted the proceeds in foreign currency to the borrower via a commercial bank in Brazil. The Brazilian bank converted the foreign currency into Brazilian currency by means of an exchange contract, whereby the borrower sold the foreign currency to the bank for Brazilian currency at the official exchange rate periodically set by the Central Bank. The Brazilian borrower received a Certificate of Registration that enabled the borrower to effect payment of interest and principal in the foreign currency in which the loan was made. On each payment date, the borrower purchased foreign currency from a Brazilian bank at the official exchange rate. The Brazilian bank then tendered the foreign currency to the foreign lender. Payment of the Withholding Tax
Brazilian law prohibits remittance of an interest payment to a foreign lender without proof of payment of the withholding tax on interest remitted abroad. Under Brazilian law, the borrower initiated payment of the withholding tax by submitting a Documento de Arrecadacao de Receitas Federais (DARF) and the accompanying tax payment to a commercial Brazilian *67 bank. Any bank making an interest payment in foreign currency which was subject to Brazilian tax would require a completed DARF and payment of the tax as evidence that the proper amount of tax had been paid. [2] Thus, for net loans, payment of the Brazilian tax on interest remitted abroad occurred simultaneously with the payment of interest. *68 Institution of the Pecuniary Benefit
Under Decree-law 1,215, enacted May 4, 1972, the Brazilian Minister of Finance was given discretion to grant a reimbursement or reduction of, or exemption from, the withholding tax on interest provided the borrower's costs were reduced, the loan was of national interest, and the loan complied with other conditions (such as minimum repayment terms) set forth by the Ministry of Finance. Decree-law 1,351, which was enacted on October 24, 1974, authorized the National Monetary Council [3] to temporarily reduce the income tax on interest, commissions, and expenses remitted to persons resident or domiciled abroad. On the same date as Decree-law 1,351 was enacted (i.e., October 24, 1974), the Central Bank issued Resolution 305, which temporarily reduced the tax on interest, commissions, and expenses received on cash loans registered with the Central Bank from 25 percent to 5 percent. *69 Decree-law 1,411, enacted July 31, 1975, amended Decree-law 1,351 and allowed the National Monetary Council to: (1) Reduce the income tax on interest, commissions, and expenses remitted to persons resident or domiciled abroad, or (2) grant pecuniary benefits to Brazilian borrowers receiving loans in foreign currency. On August 5, 1975, the Central Bank issued Resolution 334 which revoked Resolution 305, thereby reinstating the 25-percent tax on interest, commissions, and expenses paid on cash loans registered with the Central Bank. Mechanics and Amount of the Pecuniary Benefit
On the same day that the 25-percent tax on interest was reinstated (i.e., August 5, 1975), the Central Bank issued Resolution 335, which provided that borrowers taking out foreign loans duly registered with the Central Bank would receive a pecuniary benefit equal to 85 percent of the tax paid on the interest, commissions, and expenses due on such loans. Also on August 5, 1975, the Central Bank issued circular 266, which provided in part that: a. a DARF would be used for the payment of the 25-percent income tax on interest resulting from foreign currency loans; b. on the date of payment, *70 the banking establishment receiving the payment would, by means of a credit to the borrower's account, pay to the borrower the equivalent of 85 percent of the income tax; and c. the banking establishment receiving the tax payment would debit its own account entitled "Pecuniary Benefit -- D.L. 1,411," and would charge the total value of the pecuniary benefit against the Central Bank.
On July 26, 1979, the pecuniary benefit was reduced to 50 percent of the tax. On December 7, 1979, the pecuniary benefit was increased to 95 percent of the tax; on May 8, 1980, the pecuniary benefit was reduced to 40 percent of the tax; and on July 28, 1985, the pecuniary benefit was reduced to zero. Resolution 63 Loans
Many Brazilian companies that needed working capital were not able to provide foreign lenders with adequate financial information or proper guarantees to obtain a loan. To provide Brazilian companies with the funds needed for their development, and in keeping with the Brazilian Government's efforts to develop the country's economy and generate foreign exchange, the Central Bank issued Resolution 63 on August 21, 1967. Resolution 63 permitted certain Brazilian banks *71 to borrow funds from abroad for the specific purpose of relending (repassing) the corresponding borrowed funds in Brazilian currency to Brazilian companies (repass borrowers). The charges paid by a repass borrower to a Brazilian bank were in the same proportion as the charges paid by the Brazilian bank to the foreign lender. The loan between the foreign lender and the Brazilian bank was separate and independent from the loan between the Brazilian bank and the repass borrower. The foreign lender had no legal relationship with the repass borrower and in general did not know the repass borrower's identity. Foreign loans which were repassed under Resolution 63 were subject to the same restrictions on the receipt and exchange of foreign currency as other foreign loans. Circular 266 provided that in the case of a Resolution 63 loan, the bank receiving the foreign loan was required to transfer the total value of the pecuniary benefit to the borrower receiving the repass funds, and in cases in which the foreign loan was transferred to several repass borrowers, the pecuniary benefit was transferred proportionally to each of such borrowers. Details of Repass Lending Under Resolution *72 63
Generally, a foreign lender was concerned only with the credit risk of the Brazilian bank. The initiative to borrow foreign funds for lending to local companies under Resolution 63 was that of the Brazilian bank, which would repass loans if and when local borrowers were available. In making Resolution 63 loans to Brazilian banks, foreign lenders generally assumed that the Brazilian bank would pass through its cost of funds (the cost of the foreign lender's loan) and charge a spread or commission to the repass borrower. The Brazilian bank was allowed to charge its borrower only a repass commission. The repass commission was usually calculated as a set percentage per year of the principal balance of the repass loan. The amount of the repass commission was the same as the commission charged for other types of loans. During the years in issue, there was no limit on repass commissions, and the commission was as high as 10 percent, depending upon the individual repass borrower's credit. Except for the term of the loan, all other financial conditions of the loan between the Brazilian bank and the repass borrower had to be the same as those between the foreign lender and the *73 Brazilian bank. If the interest rate charged by the foreign lender to the Brazilian bank was net of the Brazilian withholding tax, then the interest rate payable by the repass borrower was likewise net of the Brazilian withholding tax. If the Brazilian bank was entitled to a pecuniary benefit, then it passed on such benefit to the repass borrower. The transfer of the pecuniary benefit from the Brazilian bank to the repass borrower reduced the repass borrower's cost of the repass loan, and thus encouraged foreign borrowing. Beginning in 1974, Resolution 63 funds not utilized in repass operations could be deposited with the Central Bank. When such funds were deposited, the Central Bank paid the interest on the foreign loan; and if there was a net loan involved, no withholding tax was paid with respect to the Central Bank's interest payment. Brazilian Tax Law
The Brazilian tax system is divided into three types of authority: the Federal Constitution of Brazil (Federal Constitution), the National Tax Code, and ordinary Federal, State, and municipal legislation. The Federal Constitution divides the authority to tax among the Federal Government, the States, and the municipalities *74 of Brazil. Pursuant to Article 21 of the Federal Constitution, the Federal Government has authority to impose all types of taxes, including a tax on income, except as otherwise granted by the Federal Constitution to the States or municipalities. The National Tax Code establishes the parameters within which the taxing authority of the Federal Government, the States, and the municipalities may be exercised. It does not, in and of itself, create or impose any taxes. Article 4 of the National Tax Code specifies that the legal nature of a tax is determined by its generating factor (that is, the taxable event); the name and other formal characteristics of the tax are irrelevant to the legal nature of the tax. Article 113 of the National Tax Code divides tax obligations into principal and accessory obligations. The principal obligation is created by the taxable event, and has as its objective the payment of tax. The accessory obligation is derived from the tax legislation and has as its objective the performance of specific acts (e.g., maintaining books and records, filing returns) in the interest of collection of the tax. The taxable event which gives rise to the tax on income is *75 the economic or legal availability of such income. Under article 45 of the National Tax Code, the person entitled to "the economic or legal availability of income" is called the contribuente, or taxpayer. However, the status of the contribuente can be attributed to the holder of the assets producing the income or earnings. In addition, the source making payment of the income can be liable for the tax if such source is required by law to withhold and pay such tax to the Brazilian Treasury. Under article 121 of the National Tax Code, the person obligated to make the payment of the tax is called the "passive subject" of the principal obligation. The passive subject of the principal obligation is either: (1) The contribuente, when he has a personal and direct relationship with the taxable event or (2) the responsavel (responsible or person liable) when, without having the status of a contribuente, he has an obligation to pay the tax by an express provision of law. Article 122 of the National Tax Code defines the passive subject of an accessory obligation as the person obligated to perform the duties which comprise the accessory obligation. Article 123 of the National Tax Code specifies *76 that, except as otherwise provided by law, private agreements concerning the liability to pay taxes are not binding on the public treasury. Article 128 of the National Tax Code provides that the liability for a tax claim may be assigned to a third party who is related to the taxable event which gives rise to the tax obligation. Since 1943, Brazilian Federal legislation has provided for a withholding tax imposed on interest paid by Brazilian borrowers to foreign entities, at the following rates: Rate
Years
10%
1944-1947
15%
1948-1954
20%
1955-1958
25%
1959-1974
5% 1974-1975
25%
1975-Present
Position of Parties
For tax purposes, petitioner grossed-up [4] the amount of interest FNBC received with regard to its net loans and claimed a foreign tax credit for the 25-percent withholding tax. In his notice of deficiency, respondent disallowed a portion of the foreign tax credits claiming that the pecuniary benefits paid by the Brazilian Government reduced FNBC's payment of Brazilian tax, and correspondingly decreased FNBC's interest income. The Brazilian withholding taxes disallowed by respondent, and the breakdown between pecuniary benefits paid to FNBC's borrowers *77 and pecuniary benefits paid with respect to Resolution 63 loans were as follows: Breakdown
Disallowance
Attributable to
Pecuniary Benefit
Pecuniary Benefit
Pecuniary Benefit
to Borrowers
With Respect to
Year
Issue
From FNBC Resolution 63 Loans
1978
$ 253,997   $ 248,603  $ 5,394    1979
582,526
199,081
383,445
1980
3,058,732
1,000,558
2,058,174
1981
2,681,057
218,536
2,462,521
1982
3,289,006
726,873
2,562,133
1983
2,981,358
1,323,905
1,657,453
TOTALS
$ 12,846,676
$ 3,717,556
$ 9,129,120
*78 In his Amendment to the Answer to petitioner's Amended Petition, respondent takes the position that, in addition to the above disallowances, petitioner was not entitled to any foreign tax credits claimed with respect to Brazilian withholding taxes paid by Brazilian borrowers on FNBC's net loans on the theory that FNBC was not legally liable for such withholding taxes. The additional disallowances sought by respondent in his Amendment to his Answer were as follows: Disallowance
Total
Disallowance
Attributable to
Disallowance
Attributable to
Legal Liability
of Foreign
Year
Pecuniary Benefit Issue
Issue
Tax Credits
1978
$ 253,997   $ -0-       $ 253,997   1979
582,526
2,542,661
3,125,187
1980
3,058,732
3,231,773
6,290,505
1981
2,681,057
4,021,525
6,702,582
1982
3,289,006
5,305,196
8,594,202
1983
2,981,358
5,569,397
8,550,755
TOTALS
$ 12,846,676
$ 20,670,552
$ 33,517,228
OPINION Section 901 allows a domestic corporation to claim as a credit against its Federal income tax (subject to certain limitations not applicable herein) the amount of any income taxes which such corporation pays or accrues to a foreign country. The regulations *79 make it clear that a credit under section 901 is available for foreign taxes paid on behalf of a domestic corporation. Sec. 4.901-2(a), Temporary Income Tax Regs., 45 Fed. Reg. 75647 (Nov. 17, 1980).[5]
A foreign tax is creditable only if the taxpayer is legally liable for the tax. Sec. 4.901-2(g), Temporary Income Tax Regs., supra. Respondent claims that only the Brazilian borrower was legally liable for the Brazilian withholding tax on interest remitted abroad. Therefore, respondent argues, FNBC was not legally liable for the Brazilian withholding tax, and thus such tax is not creditable under section *80 901. For the same reasons expressed in Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765 (1987), and in Continental Illinois Corp. v. Commissioner, T.C. Memo 1988-318, affd. without published opinion sub nom. Citizens and Southern Corp. and Subsidiaries v. Commissioner, 900 F.2d 266 (11th Cir. 1990), which need not be repeated here, we hold that FNBC is liable for the Brazilian withholding tax and hence is entitled to a foreign tax credit. We now turn to whether the pecuniary benefits or subsidies which FNBC's borrowers received from the Brazilian Government reduce the amount of foreign tax creditable under section 901. Respondent contends that if FNBC was legally liable for the Brazilian tax, then the amount of the creditable tax must be reduced by the subsidies FNBC's borrowers received. The holdings in Nissho Iwai American Corp. v. Commissioner, supra, and in Continental Illinois Corp. v. Commissioner, supra, control the resolution of this issue. Accordingly, we hold that the subsidies Brazil paid to Brazilian borrowers herein reduce the amount of petitioner's foreign *81 tax credit. Finally, petitioner argues that the subsidies which Brazilian banks passed through to repass borrowers in Resolution 63 lending transactions should not reduce its foreign tax credit. Section 4.901-2(f), Temporary Income Tax Regs., supra, provides: (f) Amount of income tax paid or accrued -- (1) In general. A credit is allowed under section 901 for the amount of income tax (within the meaning of section 4.901-2(a)(1)) that is paid or accrued to a foreign country, subject to the provisions of this paragraph (f). * * * (3) Subsidies -- (i) General rule. An amount is not income tax paid or accrued to a foreign country to the extent that -- (A) The amount is used directly or indirectly by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and (B) The subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.
(ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that -- * * * (B) Engages in a business *82 transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.
In a Resolution 63 loan, there are two different agreements: one between the foreign lender and the Brazilian bank and another between the Brazilian bank and the repass borrower. Albeit the Brazilian bank borrowed from the foreign lender in order to repass such borrowed funds to the repass borrower, the foreign lender had no legal relationship with the repass borrower, and the loan to the Brazilian bank was based solely on the Brazilian bank's credit risk. In fact, the foreign bank typically did not even know the identity of the repass borrower. Although the Brazilian bank transferred a pro rata portion of the subsidy to which it was entitled to the repass borrower, it did so because the Brazilian bank was allowed to charge the borrower only a repass commission. All other financial conditions of the loan between the Brazilian bank and the repass borrower had to be the same as those between *83 the foreign lender and the Brazilian bank. Because the subsidy reduced the Brazilian bank's costs, the Brazilian bank was required to pass such savings on to the repass borrower. Both the payment of the withholding tax and the repass borrower's receipt of the subsidy were inextricably linked to the transaction between the foreign lender and the Brazilian bank. Hence, the provisions of section 4.901-2(f) (3)(ii)(B), Temporary Income Tax Regs., supra, are applicable to Resolution 63 loans, and the subsidies paid to repass borrowers reduce petitioner's foreign tax credit. See Continental Illinois Corp. v. Commissioner, supra.
This opinion resolves only the Brazilian foreign tax credit issues; all other issues not previously decided are still before the Court. An appropriate order will be issued. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The borrower prepared the DARF and delivered a copy of the DARF and the registration certificate to the Brazilian bank (or U.S. branch bank) handling the payment of interest through a foreign exchange contract. The bank recorded the amount of interest and tax on the Certificate of Registration and submitted the certificate, exchange contract and DARF to the Central Bank for approval. Upon approval by the Central Bank, the bank remitted the interest to the foreign lender and returned to the borrower a stamped copy of the DARF, the Certificate of Registration (stamped) and a copy of the exchange contract. The borrower sent a copy of the DARF to the foreign lender which then had proof (the DARF) that the withholding tax was paid. The lender performed no act in Brazil for the collection of tax.↩
3. The National Monetary Council is a Government agency responsible for economic programs. It acts through the Central Bank.↩
4. The withholding tax is computed as a percentage of the lender's gross income, and thus when a Brazilian borrower discharges a U.S. lender's tax obligation, a gross-up adjustment is necessary to determine the lender's gross income. For example, if the borrower was required to pay the foreign lender $ 9 in interest net of Brazilian tax, and the tax rate was 25 percent, then the amount of gross income would be $ 12 [$ 9 net interest received / (1-25% tax rate)] so that the 25-percent withholding tax would result in a tax payment of $ 3 ($ 12 gross income X 25% tax = $ 3 tax payment).↩
5. In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit. These temporary regulations, sec. 4.901-2 et seq., generally were made applicable to taxable years ending after June 15, 1979. Final regulations under sec. 901↩ were made effective for taxable years beginning after Nov. 14, 1983.