Opinion for the Court filed by Circuit Judge BROWN.
Dissenting opinion filed by Circuit Judge GRIFFITH.
BROWN, Circuit Judge:
In prior litigation, PNC Financial successfully claimed a foreign tax credit for taxes paid on its behalf in Brazil. That credit, the Internal Revenue Service argues, must be reduced by the amount of an indirect subsidy PNC received from the Brazilian government. The Tax Court agreed, and we now affirm.
I
In an international tax case as complicated, economically and litigiously, as this one, we do well to start with the basics.' When a U.S. bank makes a loan abroad, the interest income is susceptible to tax in both the United States and the foreign state. Congress avoids double-taxing international business by giving a credit for taxes paid to the foreign government, less any credit, refund, or subsidy given the taxpayer by the foreign government. I.R.C. § 901; Treas. Reg. § 1.901 — 2(e). Interest income of $100,000, for example, where the relevant tax rate in the U.S. was 50% and in the foreign country was 25% with a 10% refund, would work out to $15,000 to the foreign country and $35,000 to the IRS. Were the foreign rate 50% with no refund, $50,000 would flow to that country and nothing to the IRS. Thus the two countries are on a see-saw: When one country’s tax revenue goes up, the other’s goes down.
This case, or rather this iteration of this case (for it is the third time we have heard an appeal from the Tax Court concerning the same transaction), is a peculiar elaboration of these simple principles.[1] During the 1970s and early 1980s, in an effort to increase its reserves of foreign currency, Brazil’s government borrowed and (using tax breaks) encouraged its people to borrow substantial amounts from foreign lenders. In 1982, fiscal crisis led nearly to default on the loans, and Brazil embarked on a debt restructuring plan with an international consortium of banks. According to the plan, Brazil’s government-controlled Central Bank stepped in as common debt- or for the foreign banks, becoming a middleman on the old loans (paying the creditors what was owed to them from the original borrowers and in turn receiving payments from the original borrowers) and, since Brazil still needed foreign credit to function, borrowing billions of dollars in additional funds. Appellant PNC Financial Services Group, Inc. (formerly Riggs National Corporation and Subsidiaries) lent a portion of those additional funds. In 1984 and 1985, Brazil taxed PNC’s interest income at a 25% rate, which came to $166,415 in 1984 and $181,272 in 1985. But a provision of Brazilian law, hanging on from happier economic days when the *121 Brazilian government incentivized borrowing from foreign lenders, gave subsidies for these taxes worth 40% of the total- — ■ $66,566 in 1984, and $72,509 in 1985. This appeal is about the U.S. tax treatment of that $139,075 in subsidies. At first glance, it seems obvious enough that PNC should receive a credit of $166,415 less $66,566 toward its 1984 U.S. income tax, and $181,272 less $72,509 toward its 1985 U.S. income tax. But three factors complicate the picture.
First, PNC’s loans to the Central Bank were “net,” not “gross.” Riggs II gives a matchless explanation of the difference, which we will not belabor here. Suffice it to say that in a gross loan agreement, the lender pays local (Brazilian) taxes on his interest income (or the borrower withholds it), while in a net loan, the borrower “contractually agrees not only to pay interest to the lender, but also to pay any local (Brazilian) tax that the lender owes on that interest income.” Riggs II, 163 F.3d at 1364. This is not necessarily a boon to lenders, for all else being equal, lenders must compensate borrowers for paying lenders’ taxes with lowered interest rates. “The real difference between gross loans and net loans,” Riggs II explains, “lies not in who licks the stamp on the envelope to the Brazilian government, but in who bears the economic burden of the tax.” Id. With a net loan, the borrower bears that burden, for the borrower faces the risk of change in local tax rates, while the lender’s net income (the interest payments) is stable. With a gross loan, the lender suffers the loss or reaps the benefit of change; it is his net income that might vary with taxes. Either way, however, the foreign government imposes legal liability for the local tax on the lender, and so either way the IRS credits the foreign tax payments. Treas. Reg. § 1.901-2(f).[2]
Second, the Central Bank is, as Riggs II put it, “no ordinary Brazilian borrower.” 163 F.3d at 1366. Created by law to implement Brazil’s monetary and fiscal policies (including issuing currency), required to act on behalf of Brazil’s government and prohibited from acting on behalf of anyone else, able to contract in the name of the National Treasury, responsible for managing foreign lending to Brazilian borrowers, and under the control of the Minister of Finance, the Central Bank is 100% a part of Brazil’s federal government, as all parties agree. The Federal Constitution of Brazil makes the Central Bank immune *122 from tax on its own income, and in fact until 1988 the Central Bank operated, along with the National Treasury and the Banco de Brasil (in which Brazil’s government held a controlling share), a centralized system for funding Brazil’s government that jointly controlled Brazil’s tax revenue (although it was the Banco de Brasil that actually held the government’s tax revenue in its coffers). Thus, if it were legally possible for the Brazilian government to impose a tax on its Central Bank, it is not clear how it would be economically possible for the Central Bank to pay it: At most, the money would go from the Brazilian government’s right pocket to its left. And so when the Central Bank takes out net loans from a U.S. lender, certain questions arise: Will Brazilian law, in keeping with the principle that tax payments incidental to net loans are payments on behalf of lenders, require the Central Bank to pay despite the Bank’s constitutional immunity from taxes? If so, should the IRS credit those payments? If the Brazilian government refunds a portion of them to the Central Bank, should the IRS subtract some of the refund from the credit?
We must pause at this point to understand PNC’s and the Central Bank’s (or rather, Brazil’s) interests on the eve of their lending arrangement. Only if the Central Bank was subjected to compulsory tax payments on PNC’s behalf could PNC qualify for the § 901 credit. See Riggs II, 163 F.3d at 1365-66. And such payments would represent no economic burden for Brazil even if the Central Bank actually moved cash from its (government-eon-trolled) vaults to the Banco de Brasil’s (government-controlled) vaults. See id. at 1369. So both PNC and Brazil had an interest in seeing the Central Bank subjected to the compulsory payments. For PNC, every cent thus paid to the Brazilian government was money PNC would not have to pay to the IRS,[3] and for Brazil, the “tax” just meant, so far as we can tell, more credit at a lower interest rate. The only loser in the arrangement was the IRS, which, economically speaking, would simply have transferred wealth to Brazil for Brazil and PNC to split. See id. The IRS ends up on the wrong end of the seesaw.
Only the Central Bank’s constitutional immunity from taxes stood in the way, and the third complexity in this case concerns how that immunity was overcome. Given their interest in the foreign tax credit, PNC and other banks went to Brazil’s highest ranking authority on tax matters, the Minister of Finance, to request definitive guidance on whether the Central Bank would be subjected to the compulsory tax payments on their behalf. The most natural way for the Minister to answer “Yes” would have been to hold the Central Bank’s tax immunity inapplicable in net loan arrangements, since the tax-immune entity pays standing in the lender’s shoes. But this way was closed: Brazilian law already had authority for the opposite proposition. Id. at 1366. Another way, however, was open, for the money PNC loaned the Central Bank was available and officially intended for re-lending to private borrowers in Brazil. If the Central Bank could not stand in for the private lenders, perhaps it could stand in for these private borrowers. The Minister issued a private letter ruling, not available to the public but binding on the parties under Brazilian law, which Riggs II describfes:
*123 The Minister deemed it appropriate to “look through” the Central Bank to those ultimate private borrowers — so-called “borrowers-to-be” — for purposes of deciding the proper tax treatment of the loans. And it was settled Brazilian law that a private borrower in a net loan was required to pay the tax obligation it had contractually assumed from the lender. The Minister concluded that the “borrowers-to-be” aspect of the loans compelled an analogy to the garden variety private borrower situation, and that the Central Bank must “as a substitute for such borrowers [to-be] pay the income tax incident on the interest.... ”
Id. (first alteration in original). This reasoning further complicates the IRS’s § 901 question. If the Brazilian Revenue Service looks through the Central Bank’s tax-immune status because the Central Bank stands in for borrowers-to-be, should the IRS follow suit' in granting credits and subtracting subsidies? Should' it matter that, in the event, none of the money ever was re-loaned?
As a statutory matter, these questions shape up as interpretations of I.R.C. § 901 and associated portions of the 1984 and 1985 Tax Code and regulations. In Riggs I, the issue was whether to permit the foreign tax credit at all, and it turned on whether the Central Bank’s tax payments were compulsory, as the Minister had ruled, or voluntary. The Tax Court, viewing the Minister’s private letter ruling as nothing more than “perhaps an administrative advisory .opinion,” conducted its own analysis of Brazilian law, concluded that the payments were voluntary, and denied PNC the credit. 1996 WL 707024, at *36, 1996 U.S. Tax Ct. LEXIS 49, at *119. We reversed in Riggs II. As we saw it, the Tax Court had sat in judgment on and effectively declared invalid the Minister’s order to the Central Bank to pay taxes — a foreign sovereign’s official act within its own territory. The act of state doctrine shields such acts from American courts’ review. 163 F.3d at 1367-68. We remanded “so that the Tax Court may determine in the first instance ... whether the taxes were in fact paid by the Central Bank, and whether Riggs’ credits must be reduced by the amount of any subsidies that the Central Bank may have received.” Id. at 1369.
Riggs III and IV resolved the first of those two questions. In Riggs III, citing accounting irregularities, the Tax Court held that PNC “failed to establish that the withholding taxes in issue were paid by the Central Bank on petitioner’s behalf.” 2001 WL 47274, at *17, 2001 Tax Ct. Memo LEXIS 20, at *66. Since PNC was (again) ineligible for the credit, the Tax Court did not reach the subsidies issue. But in Riggs IV, we reversed. PNC had submitted official Brazilian receipts stating that the tax had been paid. These receipts were entitled to the common law’s “presumption of regularity” for “the official acts of public officers,” and while this presumption was rebuttable, the accounting irregularities that moved the Tax Court weren’t the sort of “clear or specific evidence” needed to rebut it. Riggs IV, 295 F.3d at 21 (internal quotation marks omitted). There could no longer be any question that PNC was entitled to a foreign tax credit. Riggs IV remanded “to determine whether the tax credits should be reduced by any subsidies that may have been paid to the Central Bank.” Id. at 23.
Riggs V takes up this last issue. In 1984 and 1985, recall, Brazil had a subsidies system (sometimes called a “pecuniary benefits” system in this litigation) that effectively returned 40% of any tax payment Brazilian borrowers in international net loans made on their foreign lenders’ behalf. Mechanically, the two halves of the transaction — making -the tax payments and receiving the subsidy' — were “simulta *124 neous[],” both occurring “before paying the interest to the foreign lender” and in such a way as to credit Brazil’s national treasury “ ‘only with the amount by which the withholding tax exceeded the subsidy.’ ” Riggs V, 2004 WL 938295, at *11, 2004 Tax Ct. Memo LEXIS 110, at *34-36 (quoting Nissho Iwai Am. Corp. v. Comm’r, 89 T.C. 765, 770, 1987 WL 45300, 1987 U.S. Tax Ct. LEXIS 142, at *11). In the Tax Court, no one doubted that this arrangement would have amounted to an indirect subsidy and properly reduced PNC’s foreign tax credit had the borrower been a private party; past litigation in what have come to be called “the Brazilian tax cases,” Amoco Corp. v. Comm’r, 138 F.3d 1139, 1145 (7th Cir.1998), laid that question to rest. See Norwest Corp. v. Comm’r, 69 F.3d 1404, 1407-10 (8th Cir.1995) (finding an indirect subsidy to the extent that the Brazilian government rebated a portion of the taxes Brazilian borrowers paid on U.S. lenders’ behalf); Cont'l Ill. Corp. v. Comm’r, 998 F.2d 513, 519-20 (7th Cir.1993) (same); First Chi. Corp. v. Comm’r, 61 T.C.M. (CCH) 1774, 1991 WL 10966, 1991 Tax Ct. Memo LEXIS 63, at *18-19, *21 (same); Nissho Iwai, 1987 WL 45300, 1987 U.S. Tax Ct. LEXIS 142, at *24, *27 (same). What makes this case unique is the presence of and role played by the Central Bank standing in for private borrowers. The financial identity between the Central Bank and the Brazilian government, the same thing that had made it puzzling to think of the Central Bank making compulsory tax payments, also makes it puzzling to think of the Central Bank receiving governmental subsidies. But taking its cue from the Brazilian Minister of Finance’s private letter ruling, the Tax Court held that the Central Bank received the subsidy “not ... as an agent of the Brazilian Government, but rather on behalf of the borrowers-to-be,” so that it was “proper to treat the Central Bank as separate from the Brazilian Government” for purposes of the subsidy regulation. Riggs V, 2004 WL 938295, at *18, 2004 Tax Ct. Memo LEXIS 110, at *56.
PNC has appealed and now the issue of the subsidy is before us.
II
PNC’s position in this appeal is that the Brazilian government cannot give its Central Bank a subsidy because the two are, for tax purposes, one and the same. The subsidy regulation applicable at the time, Treas. Reg. § 1.901-2(e)(3) (1984),[4] has, functionally, three parts. First, it defines a foreign subsidy as a payment “by any means (such as through a refund or credit),” by the foreign country to the taxpayer or someone engaged in a transaction with the taxpayer, where the payment “is determined, directly or indirectly, by reference to the amount of income tax.” Second, it regulates direct subsidies: If a foreign country pays a subsidy directly to a taxpayer, that amount must be subtracted from the taxpayer’s foreign tax credit. Third, distinguishing indirect subsidies, it states that “[a] foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that ... [e]ngages in a transaction with the taxpayer”; here too the subsidy must be subtracted from the credit. The Brazilian government’s payments to its Central Bank, calculated by taking 40% of the income tax PNC owed Brazil, fit the definition of a subsidy but clearly are not direct subsidies, as all parties agree. The question is whether those payments qualify as *125 indirect subsidies. PNC claims they do not because “[t]he Central Bank is part of the Brazilian government; indeed, as far as Brazil’s finances are concerned, the Central Bank is the Brazilian government.” Appellant’s Reply Br. 1 (emphasis in original). Therefore “the Brazilian government paid the subsidy in question to itself,” which, PNC argues, puts the payments outside the indirect subsidy regulation. The sole issue before us is whether, in the circumstances of this case, the Brazilian government’s subsidy was paid “to another person” within the meaning of Treasury Regulation § 1.901-2(e)(3).
As a threshold matter, we must determine what it means for the recipient of a subsidy to be “another person”: Does this mean a person other than the foreign country, or other than the taxpayer? Read in isolation, § 1.901-2(e)(3), with its careful distinction between direct and indirect subsidies, appears to ask whether the recipient is the taxpayer. However, because the indirect subsidy regulation seems on the whole to contemplate a transaction with three parties (foreign government, U.S. taxpayer, and U.S. taxpayer’s local partner), the opposite approach— which PNC advocates — is also plausible, especially as it avoids the notion of a government paying a subsidy to itself. As the Commissioner has not opposed PNC’s reading, we shall assume for purposes of this appeal[5] that PNC’s § 901 credit should be reduced if and only if the recipient of the subsidy (the Central Bank) is a person other than the Brazilian government.
PNC points to evidence that “the Central Bank is part of the foreign country,” Appellant’s Reply Br. 6, and hence cannot be “another person.” If we faced this question in a vacuum — without the borrowers-to-be arrangement, without the' Minister of Finance’s private letter ruling, and without the five hearings, appeals, and remands that preceded this appeal — we might well answer it as PNC proposes. There is, after all, no denying the Central Bank’s part-to-whole relationship to the Brazilian government. But we do not operate in a vacuum; we are bound by determinations in earlier iterations of this case. PNC’s factual argument, however convincing it might be, was properly before the court in Riggs II, not here. We cannot ignore the holding in that case and consider the facts de novo. See K.N. Llewellyn, the BRAmble Bush 29, 35 (Oceana Publications 1981) (1930) (explaining how, depending on legal context or posture, the facts in a case can be far “from the reality of raw events” and “miles away from life”).
PNC’s proposed outcome would make a virtue of inconsistency, applying disparate treatment to two legs of a simultaneous transaction. Had the Central Bank handed $10 to the Brazilian government and the Brazilian government handed $5 back — or, even more accurately, had the Central Bank netted the transaction out itself and only handed over $5 in the first place — PNC would have us take legal account of the $10 and ignore the $5 given back.
*126 “Inconsistency is the antithesis of the rule of law.” LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C.Cir.1996) (en banc). Of the various doctrines, principles, and practices we use to police inconsistency, some of which go to the root of what law is, law-of-the-case doctrine is most applicable here: “[T]he same issue presented a second time in the same case in the same court should lead to the same result.” Id. (emphasis in original); see also Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (“As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.”); Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C.Cir.1995) (“When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.”). Law-of-the-case doctrine encompasses issues decided both explicitly and “ ‘by necessary implication.’ ” LaShawn A., 87 F.3d at 1394 (quoting Crocker, 49 F.3d at 739). The identity or non-identity of the Central Bank and the Brazilian government for purposes of the tax arrangement in this case was decided by necessary implication in Riggs II.
Riggs II was a subtle case. The issue was whether the Central Bank’s payments to the Brazilian government on PNC’s behalf should be regarded as voluntary or compulsory in light of the Foreign Minister’s private letter ruling stating that the payments were compulsory. The court applied the act of state doctrine, which in its classic formulation holds that “the courts of one country will not sit in judgment on the acts of the government of another done within its own territory,” Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897), and in its modern formulation “precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory,” Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Since Banco Nacional, the doctrine has been understood to arise from the separation of powers, reflecting “the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs.” W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int’l, 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (internal quotation marks omitted).
Applying this doctrine to the Minister of Finance’s private letter ruling was not straightforward. For one thing, the doctrine is typically applied to tangible acts, like the expropriation of property, rather than the ruling of a government official. See Riggs II, 163 F.3d at 1368. For another,- applying the doctrine to a foreign official’s ruling might run contrary to Federal Rule of Civil Procedure 44.1, directing courts to independently determine issues of foreign law, and its tax law equivalent, U.S. Tax Court Rule 146. In a crucial passage threading these obstacles, the Riggs II court reasoned that
whether or not it can be said that the Brazilian Minister of Finance’s interpretation of Brazilian law qualifies as an act of state, the Minister’s order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. The Minister, after all, ordered that the Central Bank “must, in substitution of the future not yet identified debtors of the tax [ie., the borrowers-to-be], pay the income tax....” Such an order has been treated as an act of state. The Tax Court’s conclusion on Brazilian law — that no tax is imposed on a net loan transaction involving a gov *127 ernmental entity as borrower — implicitly declared “non-compulsory,” i.e., invalid, the Minister’s order to the Central Bank to pay the taxes. The act of state doctrine requires courts to abstain from even engaging in such an inquiry.
Id. (bracketed text in original) (internal citations omitted). Put in the affirmative, the holding here is that American courts must accept as given that the Brazilian government levied a compulsory tax payment on the Central Bank, where the Central Bank stood in for borrowers-to-be. Thus what Riggs II resolved by necessary implication was the staUis of or role played by the Central Bank with respect to the PNC transaction. That resolves the present appeal, for if the Central Bank stood in for borrowers-to-be when it paid PNC’s taxes, it also stood in for them when it received 40% of those tax payments back in subsidies.
PNC tries to avoid this conclusion by arguing that the Riggs II court disavowed the borrowers-to-be rationale when it refused to hold that the “Minister of Finance’s interpretation of Brazilian law qualifies as an act of state.” The act of state at issue in Riggs II, as PNC interprets the case, was solely the Minister’s order, the bare imperative to the Central Bank to pay taxes. Indeed, as PNC sees it, the act of state doctrine cannot encompass the rationale behind a foreign government’s acts. The holding of Riggs II, on this argument, ■ would be that American courts must accept as given that the Brazilian government levied a compulsory payment on the Central Bank — period.
But the borrowers-to-be rationale and the Minister’s interpretation of Brazilian law are not one and the same, and the court’s refusal to call one an act of state in no way implies rejection of the other. The Minister’s private letter ruling has three parts: the bare imperative, the borrowers-to-be rationale, and a broader discussion of the Central Bank’s legal situation in various types of financial transactions. The last of these is the likely antecedent for Riggs II’s reference to an interpretation of Brazilian law — which makes good sense when one notices that the borrowers-to-be rationale is not an interpretation of law at all. Far from rejecting the borrowers-to-be logic, Riggs II in fact repeated that rationale — indeed, restated the Minister’s order in such a way as to incorporate it— immediately after disclaiming the Minister’s interpretation of Brazilian law as an act of state: “[Wjhether or not it can be said that the Brazilian Minister of Finance’s interpretation of Brazilian law qualifies as an act of state ... [t]he Minister ... ordered that the Central Bank must, in substitution of the ... [borrowers-to-be], pay the income tax....” Id. (internal quotation marks omitted).
In concluding that the Central Bank is “another person” in the sense of the treasury regulation, we need not apply the act of state doctrine. Rather, in the interest of consistency, we need only adhere, as a law-of-the-case matter, to the necessary implications of Riggs II. There, the court held that, based on the act of state doctrine, American courts had to accept the Minister’s determination that the Brazilian government had compelled the Central Bank to remit tax payments on PNC’s behalf, standing in for the borrowers-to-be. In that role, the Central Bank was distinct from the Brazilian government. Thus, as the payment and the subsidy are both part of the same indivisible transaction, Riggs II necessarily implies' the Central Bank is likewise distinct for purposes of the subsidy.
Two last points round out this argument. First, law-of-the-case doctrine is prudential; the Supreme Court has instructed that courts may “reopen what has been decided,” though they should “as a rule *128 ... be loathf ] to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.” Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)(internal quotation marks omitted), and Arizona, 460 U.S. at 618 n. 8, 103 S.Ct. 1382); see also LaShawn A., 87 F.3d at 1393. PNC has failed to persuade us that there is error or injustice, particularly when every previous court to address the issue has regarded PNC’s tax arrangement in Brazil as a stratagem for avoiding U.S. taxes. See Riggs I, 1996 WL 707024, 1996 U.S. Tax Ct. LEXIS 49, at *41; Riggs II, 163 F.3d at 1369; Riggs III, 2001 WL 47274, at 17-18, 2001 Tax Ct. Memo LEXIS 20, at *64-66.
Second, the root principles at work here — the principle that courts must be consistent with one another and the principle that governmental entities may in some circumstances be treated as private when taking on a private role or function— have a venerable lineage. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (putting a distinction between a government’s exercises of uniquely sovereign power and ordinary private power at the heart of foreign sovereign immunity); Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 695, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion) (recognizing a traditional distinction “between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other”); Bank of the U.S. v. Planters’ Bank of Co., 22 U.S. (9 Wheat) 904, 907, 6 L.Ed. 244 (1824) (Marshall, C.J.) (“[W]hen a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen.”); Henry J. Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 758 (1982) (“[T]he most basic principle of jurisprudence [is] that we must act alike in all cases of like nature.” (internal quotation marks omitted)).
Ill
In place of the analysis above, PNC asks us to follow the Seventh Circuit’s approach from Amoco Corp. v. Commissioner, 138 F.3d 1139 (7th Cir.1998). But as described below, Amoco shares none of the factual circumstances we find dispositive here, for which reason we decline to follow it in the instant case.
Virtually every page of PNC’s briefs is studded with references to Amoco, which involved the tax consequences of a complicated oil exploration arrangement between Amoco, a U.S. oil company operating in Egypt, and the Egyptian General Petroleum Corporation, an entity owned and controlled by the Egyptian government for the purpose of managing Egypt’s oil wealth. EGPC contracted to pay Amoco’s Egyptian income tax on Amoco’s behalf— as in a net loan arrangement — and then took a credit on its own Egyptian taxes exactly equal to what it paid for Amoco. (EGPC had no tax immunity and ordinarily paid income taxes as if a commercial entity.) The question for the Seventh Circuit was whether Amoco should be permitted a foreign tax credit on its U.S. taxes under § 901, or whether the credit EGPC took in Egypt should, under the same subsidy regulation at issue in our case, count as an indirect subsidy, reducing Amoco’s U.S. credit to zero. The Tax Court had found no indirect subsidy because “EGPC was part of the Egyptian government, and thus by definition it was incapable of receiving a subsidy from itself.” Id. at 1146. The Seventh Circuit affirmed, but on *129 somewhat more modest reasoning. Finding “[t]he question of how to treat state-owned enterprises ... exceedingly complicated,” the court favored a “functional approach” over “bright-line rules” and refused to decide “whether it is impossible in all circumstances for a government to grant a subsidy to one of its wholly or majority owned enterprises.” Id. at 1146-47. In Amoco’s case, the court found no indirect subsidy for two reasons: first was EGPC’s economic identity with the Egyptian government (“EGPC’s profits go straight to the treasury, and it would never feel any losses, because the treasury would absorb them.”), and second was the fact that, as an economic matter, EGPC alone received the benefit of the credit while “Amoco unquestionably bore the economic burden of the taxes imposed on its operations by Egypt.” Id. at 1148-49.
PNC argues that its situation is identical to the one in Amoco: It too contracted with a foreign governmental entity that agreed to pay its American partner’s local taxes, received some of the tax money back, and shares an economic identity with the foreign government. Thus it too should benefit from the idea that, as PNC characterizes Amoco’s holding, “when the benefit of the subsidy is provided to the foreign government, there is no subsidy within the meaning of the regulations since it is impossible for the foreign government to subsidize itself.” Appellant’s Br. 21.
But to start with, that isn’t Amoco’s holding — or rather, it is only half of Amoco’s holding. The other half is the economic analysis concluding that the U.S. taxpayer bore all the burden of the foreign tax and received no benefit from the foreign credit — whereas in our case, the tax Brazil formally levied on its Central Bank represented only a benefit to PNC. Even more importantly, Amoco lacked every factual feature we have found decisive in this appeal: no tax immunity, no private letter ruling or equivalent, no borrowers-to-be or analogue for them, and no controlling precedent. Unless we ignore the facts and the history of this case, we are bound to regard the Central Bank as standing in for private parties. Indeed, PNC’s comparisons between the Central Bank in this case and EGPC in Amoco are premature: Logically prior to any such comparison — indeed the first analytic step in many cases that turn on someone’s or something’s governmental status — is fixing on the role that person or entity played in the particular circumstances of the case. The Seventh Circuit itself said as much (“[T]he kind of legal issue presented and the context of the suit has been more important than the label ‘governmental’ or ‘non-governmental,’” Amoco Corp., 138 F.3d at 1147) and was careful to cabin its conclusions accordingly.
IV
Both PNC and the dissent would have us answer the question of the Central Bank’s status as if indifferent to all context and background. This we cannot do. As we agree with the Tax Court that, under the facts of this case, it is “proper to treat the Central Bank as separate from the Brazilian government” and deem the bank “another person” within the meaning of the subsidy regulation, the judgment of the Tax Court is

Affirmed.

. The previous iterations of this case are, in order: Riggs Nat’l Corp. & Subsidiaries v. Comm’r, 107 T.C. 301, 1996 WL 707024, 1996 U.S. Tax Ct. LEXIS 49, (Riggs I); Riggs Nat’l Corp. & Subsidiaries v. Comm’r, 163 F.3d 1363 (D.C.Cir.1999) (Riggs II); Riggs Nat’l Corp. & Subsidiaries v. Comm’r, 81 T.C.M. (CCH) 1023, 2001 WL 47274, 2001 Tax Ct. Memo LEXIS 20 (Riggs III); Riggs Nat'l Corp. & Subsidiaries v. Comm’r, 295 F.3d 16 (D.C.Cir.2002) (Riggs IV); Riggs Nat’l Corp. & Subsidiaries v. Comm’r, 87 T.C.M. (CCH) 1276, 2004 WL 938295, 2004 Tax Ct. Memo LEXIS 110 (Riggs V). PNC Financial Services Group, Inc., merged with Riggs National Corporation and Subsidiaries and replaced its name in 2005 — else this case would be Riggs VI. For convenience, we will refer to appellant as PNC even when speaking of the Riggs I through V period.

. Working out the numbers in any particular example gets complicated. Ever since Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729, 49 S.Ct. 499, 73 L.Ed. 918 (1929), U.S. tax law has held that paying -taxes on behalf of another person constitutes income to that person: If an employer, for example, promised to pay an employee $100,000 net, where the tax rate is a flat 50%, the IRS would view the employee as receiving more than $100,000 in income. It would view him, in fact, as receiving $200,000 in income, since 50% of $200,000 is $100,000 (a natural mistake is to regard the employee as receiving $150,000 — the $100,000 in salary plus 50%); the employer would pay $100,000 to the employee and another $100,000 to the IRS on the employee's behalf. In other words, one must generate a notional income figure to calculate the tax owed where one party pays on another's behalf — whether in the United States or in Brazil, where the procedure is called "grossing-up.” Thus, if a U.S. lender contracts for $100,000 in interest income on a net loan, with a 20% foreign tax and a 50% U.S. tax, the Brazilian government would construe the lender's income to be $125,000 (the amount which, less 20%, would be $100,000) and charge $25,000 in taxes (with the borrower remitting that $25,000). The IRS would also construe the income as $125,000 and levy a 50%, $62,500 tax, minus a $25,000 foreign tax credit, which comes to $37,500 in U.S. taxes. Having paid that amount from its $100,000 in actual interest income, the U.S. lender is left with $62,500— which makes sense, being 50% of the lender’s notional income without the dual complications of a net loan and a foreign tax.

. As footnote two discusses, those payments from the Central Bank to the Brazilian government would also swell PNC's income in the IRS’s eyes, which of course means higher U.S. taxes. But the value of the credit would exceed the detriment of the larger income— and always would, so long as the U.S. tax rate was below 100%.

. In 1986, Congress codified Treas. Reg. § 1.901-2(e)(3), with some changes, at I.R.C. § 901 (i), and the IRS followed up with a revised Treas. Reg. § 1.901-2(e)(3). We discuss these changes below.

. A subsequent change in the law has rendered this analysis academic except as regards legacy cases such as this one. In 1986, Congress codified a rephrased version of Treas. Reg. § 1.901-2(e)(3) at I.R.C. § 901(i). See Tax Reform Act of 1986, Pub.L. No. 99-514, § 1204, 100 Stat. 2085, 2532. The new statutory provision eliminated the words "another person,” recognizing subsidies delivered directly or indirectly to "any party” to a transaction with the taxpayer. See also Denial of Foreign Tax Credits for Government Provided Subsidies, 56 Fed.Reg. 56,007 (Oct. 31, 1991) (similarly eliminating "another person” from the treasury regulation). As the Central Bank was a party to the net loan transaction, the reduction in the § 901 credit would be clear under the current statute.